MARIAN SMITH, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Lakeview Medical Center, Appellee).

Fourth District (Industrial Commission Division) No. 4—86—0675WC

Opinion filed July 2, 1987.

384

Scheele, Cornelius & Associates, Ltd., of LaGrange (David C. Harrison, of counsel), for appellant.

Cohn, Lambert, Ryan, Schneider & Harman, Ltd., of Chicago (Michael R. Schneider, of counsel), for appellee.

JUSTICE KASSERMAN delivered the opinion of the court:

On May 23, 1983, Marian Smith (claimant) filed an application for adjustment of claim under the Workers' Compensation Act (Ill. Rev. Stat. 1983, ch. 48, par. 138.1 *et seq.*). Claimant alleged that she sustained an accidental injury on November 11, 1982, while employed by Lakeview Medical Center (Lakeview). After a hearing pursuant to section 19(b) of the Act (Ill. Rev. Stat. 1983, ch. 48, par. 138.19(b)) an arbitrator awarded claimant temporary total disability compensation of $112.48 per week for 49⁶/₇ weeks and medical expenses in the amount of $7,241.09. On review, the Industrial Commission increased the temporary total disability award to 89²/₇ weeks and otherwise affirmed the decision of the arbitrator. On review, the circuit court of Vermilion County reversed, finding that the decision of the Industrial Commission as to causation was against the manifest weight of the evidence. The claimant has perfected this appeal.

The 47-year-old claimant was the only witness at the arbitration hearing. She testified that she was employed as an industrial medicine coordinator and that her duties were secretarial and included scheduling appointments and assessing incoming patients. On Thursday, November 11, 1982, while standing on her toes reaching to a high shelf, she "had a pulling in the right neck." She notified her supervisor, Dr. John Spencer, Lakeview's industrial doctor, but continued working that day and the next. She stated that the pain was severe and got worse on Friday. On Friday, a co-worker, Polly Hawkins, a licensed practical nurse (LPN2), gave claimant two Tylenol, then three aspirin, and then a massage. Dr. Spencer stated that claimant was having muscle spasms. Claimant told Hawkins to stop the massage because it was too painful. Claimant testified that on Saturday morning "the right side of my face was—the eye was completely closed and the whole face was down and the mouth was completely screwed under and it was numb." She complained of headaches and was in severe pain.

Claimant went to the emergency room at Lakeview Medical Center on Saturday and was admitted. Hospital records indicate that the initial diagnosis was an acute cervical strain with occipital neuralgia (pain originating in the nerves in back of the scalp). Dr. Fogel, a neurologist, performed an examination which indicated mild ptosis (drooping) and mydriasis (dilation of a pupil) of the right eye. A CAT scan and lumbar puncture were normal. Dr. Fogel's impression was acute cervical strain with radiculitis (inflammation of a root of a spinal nerve as it emerges from the spinal cord) and right occipital neuralgia. Claimant testified that Dr. Fogel prescribed a cervical collar for her to wear.

In a follow-up report dated November 24, 1982, Dr. Fogel stated that he saw claimant that day and that she felt much improved and that she was having only rare headaches, usually when she went without the cervical collar for extended periods. His examination revealed no occipital nerve tenderness or cervical spasm. He did note a mild ptosis and mydriasis of the right eye and that his prescription for the ptosis had not improved the condition. He also noted, however, that he had seen some photos that indicated that claimant had some ptosis of the right eye for a number of years. Dr. Fogel released her for work in five days with the cervical collar.

Claimant returned to work on November 29, 1982. She testified that Dr. Spencer, her supervisor, refused to allow her to wear the collar at work and refused to allow her to use a high-back chair.

A report by Lakeview's Rehabilitation Service indicates that claimant was given a home cervical unit to use. Dr. Fogel provided follow-up care for one month and claimant also saw her family physician, Dr. Hetherington. Nerve blocks were prescribed for the headaches, and she continued to use the cervical collar. Dr. Hetherington ordered vitamin studies and referred claimant to Dr. Peter Hall, a neurologist at Wishard Memorial Hospital in the Indiana University Medical Center. In a letter dated April 12, 1983, from Dr. Hall to Dr. Hetherington, Dr. Hall states that he saw claimant on April 6, 1983. He also recounts that claimant's ptosis and numbness lasted four weeks before it recovered but that "[i]n December, she developed recurrence of the same problem with numbness over the right mandible [the bone of the lower jaw] and with drooping of the right face, dilation of the right pupil, and difficulty with depth perception in the right eye. The pain is now fully resolved in the right neck and shoulder but her other problems persist." Dr. Hall was confused about the physical findings.

Claimant was admitted to Wishard Memorial Hospital on April 13,

1983, for three days. Hospital records appear to indicate that all tests were normal. Dr. Hall released claimant to return to work on April 25, 1983.

Claimant testified that her medication (Elavil, Valium, Dalmane) caused the following problems: headaches, constipation, inability to urinate, dry mouth. She further stated that she was bloated and terribly nervous.

On May 3, 1983, while claimant was at work, a co-worker dropped some trays and dishes on the cement floor behind claimant. Claimant became very agitated and was taken to the emergency room. Medication was prescribed and she was sent home. She had not returned to work as of the date of the Industrial Commission hearing. A typed note dated May 17, 1983, signed by Dr. Hetherington, states that claimant was under his care and that she will be unable to work indefinitely.

On May 31, 1983, claimant was readmitted to Wishard Memorial Hospital for nine days. Examination and testing revealed no abnormal results. Dr. Hall's discharge summary states that claimant was seen in consultation with psychiatry (Dr. Hayes). Dr. Hall stated: "At present the best final diagnosis from a neurological standpoint appears to be a musculo-skeletal [sic] sprain which has precipitated an emotional disorder." His diagnosis was "conversion reaction."

Conversion reaction, also known as conversion hysteria, is defined as: "A form of hysteria or psychoneurosis in which physical signs and symptoms are substituted for anxiety. A condition in which the cause of anxiety is converted into functional symptoms which may include blindness or deafness, paralysis, etc. The patient may derive benefits from the disabilities." 1 Schmidt's Attorneys' Dictionary of Medicine C-268 (17th ed. 1986).

In a letter report, Dr. John Hayes stated:

"I saw Ms. Smith in psychiatric consultation when she was hospitalized on the neuro-surgery service under the care of Dr. Peter Hall. I wrote a consult note on June 7, 1983, a copy of which is enclosed. This is the only occasion on which I saw Ms. Smith and it was my impression that the problems I saw were psychiatric and that she was in need of inpatient psychiatric hospitalization for further evaluation and treatment. As the note says, I thought that her psychiatric diagnoses were probably largely conversion disorder and depression. My statement in the second paragraph that she had perhaps some elements of compensation neurosis or post-traumatic neurosis was really a comment on the fact that she seemed to me to be in the posi-

tion where she was unconsciously magnifying her symptoms in order to justify her belief that she should be compensated in some way for what she saw as an enormous wrong of psychological slight. I point this out because I did not use those two terms in the more formal way that post-traumatic stress disorder might be thought of in modern psychiatric diagnostic nomenclature.

It is perhaps obvious from my few comments above and from the copy of the note that I can not provide you with an explanation as to how a reaching episode contended as the original accident subsequently caused a conversion reaction. I do not believe that to be the case and I believe that the roots of a conversion disorder are more complex psychological and social events rather than any physical trauma.

When I last saw Ms. Smith I had referred her to the Indiana University Hospital inpatient psychiatry unit under the care of Dr. Richard French. However, Ms. Smith stayed there very briefly and never really engaged in any adequate further evaluation so that my tentative diagnoses could be corroborated or refuted and she certainly was never engaged in any treatment program for any of the problems she had."

As Dr. Hayes' report mentions, claimant was transferred to the Indiana University Hospital psychiatric unit for one day. A discharge summary by Dr. Paul Flink describes that the story began in June 1982 when claimant's hours at work were reduced. Her attempt to transfer out of the department was unsuccessful. After the reaching incident claimant felt that fellow employees and physicians paid little attention to her plight. The summary also states that "she has had some difficulties with what appears to be the personnel office trying to trick her into signing papers which would release the hospital from liability for her 'accident'." The discharge diagnosis was: "adjustment disorder with depressed mood, DSM 309.00, possibility of a conversion disorder, DSM 300.11," and "possibility of neurological impairment of uncertain etiology and extent."

The record contains an "attending physician's statement," apparently an Internal Revenue Service form, signed by Dr. Hetherington, dated June 20, 1983, which indicates a diagnosis of "acute neck sprain with severe conversion reaction."

On August 11, 1983, respondent sent a letter to claimant, denying her request for an extension of her leave of absence.

On September 20, 1983, claimant was seen by Dr. I. Joshua Spiegel, a neurological surgeon, at claimant's attorney's request. His

deposition was admitted into evidence at the arbitration hearing. Dr. Spiegel conducted a physical examination and found that the right palpebral fissure, the distance between the upper and lower eyelids, had narrowed considerably and that the right pupil was slightly dilated. Other findings were normal. Dr. Spiegel stated that he reviewed other medical reports provided by claimant's attorney, including the psychiatric consultation report from the Indiana University Hospital. Dr. Speigel's diagnosis was: (1) sprain of the cervical spine; (2) paralysis of the right seventh facial nerve, cause unknown; (3) post-traumatic anxiety state. The doctor explained that the residual effect of the paralysis was all that remained, *i.e.*, the narrowed palpebral fissure. He could not ascertain when the paralysis occurred. The doctor described post-traumatic anxiety state as a group of symptoms that might come on after any moving event. It was Dr. Spiegel's opinion that the stretching injury, the massage, and the tray incident were "all responsible for the patient's current status of post-traumatic anxiety state, singly and in concert." The doctor believed claimant's post-traumatic anxiety state was disabling. Dr. Spiegel further stated that the facial paralysis and the pain, coupled with not being allowed to wear the collar and the persistence of the symptoms, worked together on a "vulnerable" individual to produce the post-traumatic anxiety state. However, Dr. Spiegel also stated that claimant's dissatisfaction with her job or other social issues could be "good enough cause" for her condition and that treating psychiatrists are more capable of determining the causes of claimant's condition.

On November 5, 1983, claimant was admitted to Carle Foundation Hospital in Urbana, Illinois, under the care of Dr. Graber, a psychiatrist, for "medical management of her depression and anxiety," *i.e.*, drug therapy. She was discharged on November 14, 1983. Claimant continued to see Dr. Graber as an outpatient, but she did not respond to the medication prescribed.

On January 26, 1984, claimant was admitted once again to Carle Foundation Hospital for two weeks for severe depression. Claimant underwent "six electroconvulsive therapies along with well modified grand mal seizures." Dr. Graber's discharge summary stated that claimant "was complaining of occasional headaches and a slight degree of memory impairment on discharge, but overall seemed much brighter, happier, and more optimistic about her future."

Claimant testified that three days after her discharge she was readmitted to Lakeview for six days under Dr. Hetherington's care. In a letter report dated February 1, 1984, Dr. Hetherington states:

"My impression, based on the thorough workup by Dr. Hall,

would have to be the same; that she sustained a rather unpleasant psychiatric back set which was brought on by the fact that she was having a great deal of difficulty in satisfying the doctor she was working for.

All the symptoms and findings could be caused by hysteria and conversion reaction occasioned by the stresses of her job. Subsequent observations tend to bear this out since there is no progression of her condition.

At the present time it is difficult to see how she could go back into any sort of a job situation because she has no confidence left in her ability to cope. This would seem to be related to the psychic trauma."

On March 19, 1984, arbitrator Angelo Caliendo awarded claimant temporary total disability compensation for the intermittent periods from November 13, 1982, through March 19, 1984, during which claimant was not working, in addition to $7,241.09 for medical expenses.

At the Industrial Commission hearing on December 19, 1984, claimant testified that she continued to see Dr. Graber and Dr. Hetherington and that she continued to take prescribed medication. She complained of headaches, of being very nervous, and of having problems with her depth perception.

On May 17, 1985, the Industrial Commission issued its notice of predecision memorandum modifying the award to include compensation to December 19, 1984, an intermittent period of 89²/₇ weeks, in addition to $7,241.09 for medical expenses. In a brief "decision on review" dated July 5, 1985, the Industrial Commission described claimant's modified award as previously stated. In a lengthy "decision and opinion on review" dated January 9, 1986, the Industrial Commission found that claimant was intermittently temporarily totally disabled for 89²/₇ weeks; however, in the decretal, the Industrial Commission ordered an award for only 49⁶/₇ weeks. This appears to be a clerical error.

The claimant has appealed, claiming the circuit court erred in reversing the Industrial Commission since the Industrial Commission's decision was not contrary to the manifest weight of the evidence. Lakeview urges that the circuit court properly reversed the Industrial Commission because claimant's depression "did not emanate" from the reaching incident. Lakeview also asserts that the award of medical expenses is contrary to the manifest weight of the evidence because: (1) the expenses were not reasonable or necessary; (2) the bills were admitted without proper foundation; and (3) the medical bills are

not part of the record on appeal.

■■ It is the Industrial Commission's function to decide disputed questions of fact, including those of causation, and to resolve conflicting medical opinions. (*Material Service Corp. v. Industrial Com.* (1983), 97 Ill. 2d 382, 387, 454 N.E.2d 655, 657.) A reviewing court should not disturb the decision of the Industrial Commission unless that decision is contrary to the manifest weight of the evidence. See *Berry v. Industrial Com.* (1984), 99 Ill. 2d 401, 407, 459 N.E.2d 963, 966.

In his deposition, Dr. Spiegel diagnosed petitioner's condition as a sprain of the cervical spine, residual paralysis of the right seventh facial nerve, and post-traumatic anxiety state. Dr. Spiegel also stated his opinion that the stretching injury, the massage, the tray incident, the facial paralysis, the pain, not being allowed to wear the cervical collar and the persistence of the symptoms were all responsible for claimant's condition. Dr. Hall's diagnosis was "a musculo-skeletal [*sic*] sprain which has precipitated an emotional disorder," a conversion reaction. A discharge summary from the Indiana University Hospital psychiatric unit notes a diagnosis of adjustment disorder with depressed mood, possibility of a conversion disorder, and possibility of neurological impairment of uncertain etiology and extent. Dr. Hetherington's diagnosis was acute neck sprain with severe conversion reaction.

■■■ We conclude that this evidence is sufficient to establish a causal connection and to support the Industrial Commission's award. It is settled that a disability caused by a neurosis is compensable if it results from an accidental injury. (*Spetyla v. Industrial Com.* (1974), 59 Ill. 2d 1, 5, 319 N.E.2d 40, 43; see *Veritone Co. v. Industrial Com.* (1980), 81 Ill. 2d 97, 405 N.E.2d 758; *Pathfinder Co. v. Industrial Com.* (1976), 62 Ill. 2d 556, 343 N.E.2d 913.) A work-related injury need not be the sole or even the dominant factor causing disability. (*Jefferson Electric Co. v. Industrial Com.* (1976), 64 Ill. 2d 85, 91, 354 N.E.2d 363, 366.) In the case at bar, the Industrial Commission could legitimately infer that claimant's psychological disability was caused, at least in part, by the initial reaching incident and the resultant physical ailments. The Industrial Commission was at liberty to infer that claimant's disability was aggravated, at least in part, by the manner in which she was treated by her supervisor, or by other difficulties at work or the incident involving the trays. Even if claimant was a "vulnerable" individual, as Dr. Spiegel testified, this does not bar a recovery. A preexisting condition does not preclude an award of compensation where the Industrial Commission may legitimately infer

from the evidence that the claimant's occupational activity was a causative factor in the injury. *Sears, Roebuck & Co. v. Industrial Com.* (1980), 79 Ill. 2d 59, 66, 402 N.E.2d 231, 235.

Lakeview relies on the letter report authored by Dr. Hayes at Wishard Memorial Hospital. While diagnosing claimant as having a conversion disorder and depression, Dr. Hayes also believed that claimant was "unconsciously magnifying her symptoms in order to justify her belief that she should be compensated in some way for what she saw as an enormous wrong of psychological slight." Dr. Hayes did not believe the reaching episode caused the conversion reaction but that "the roots of the conversion disorder are more complex psychological and social events rather than any physical trauma."

■■ ■ However, Dr. Hayes' opinion does not specifically rule out the reaching episode as a cause of the disability, and does not rule out claimant's other employment circumstances as possible aggravating factors. Furthermore, the report itself indicates that Dr. Hayes' diagnoses were based solely on a consultation and were only tentative. Nevertheless, if Dr. Hayes' report is considered as a conflicting medical opinion, it is well-established that resolving conflicts in the evidence and drawing inferences from the testimony are matters within the province of the Industrial Commission; a reviewing court will not disregard permissible inferences merely because other inferences might have been drawn. (*Berry v. Industrial Com.* (1984), 99 Ill. 2d 401, 406-07, 459 N.E.2d 963, 966.) This is especially true in a case involving aggravation of a preexisting condition, where substantial deference should be given to the Industrial Commission because of its expertise. 99 Ill. 2d 401, 407, 459 N.E.2d 963, 966, citing *Long v. Industrial Com.* (1979), 76 Ill. 2d 561, 565-66, 394 N.E.2d 1192, 1194.

In its brief, Lakeview complains of the Industrial Commission's reliance on Dr. Hall's diagnosis, stating: "The excerpts [medical records] were admitted subject to section 16 of the Workers' Compensation Act only for 'the medical and surgical matters stated therein' and should not be elevated to the level of opinion testimony." Section 16 of the Act provides in part:

> "The records kept by a hospital, certified to as true and correct by the superintendent or other officer in charge, showing the medical and surgical treatment given an injured employee in such hospital, shall be admissible without any further proof as evidence of the medical and surgical matters stated therein, but shall not be conclusive proof of such matters." Ill. Rev. Stat. 1983, ch. 48, par. 138.16.

■ When claimant offered her first exhibit, consisting of medical

records, Lakeview's counsel stated that he had no objections and then stated: "We don't necessarily sanction the findings nor opinion but we have no doubt those are his records." With respect to the admission of later exhibits, Lakeview's counsel stated either: "No objection with same comment," or "Subject to Section 16, no objection," or something similar. We conclude, therefore, that Lakeview did not preserve any specific objection to the admission of the medical records.

■ Lakeview further urges on appeal that the Industrial Commission erred in its award of medical expenses. In this regard, we note that the only evidence in the record on appeal concerning medical expenses incurred by claimant is a summary of her visits to Dr. Hetherington from March 7, 1983, to May 17, 1983. This summary, in the total amount of $170, is found in an attending physician's statement (an insurance company form). Claimant's exhibit number 10 at the arbitration hearing consisted of alleged documentation of claimant's medical expenses and was admitted into evidence over Lakeview's objection, "subject to liability and reasonableness and necessity." The parties agreed that this exhibit was not made part of the record before the Industrial Commission, the circuit court or this court. Claimant requests that, since this proceeding was a section 19(b) hearing, she should be allowed to resubmit the medical bills upon remand to the Industrial Commission. Lakeview urges that the absence of evidentiary support for the medical expense award in the record before this court is a fatal defect.

Section 19(b) of the Workers' Compensation Act provides that a party requesting review of an arbitrator's decision, Lakeview in the case at bar, must file with the Industrial Commission either an agreed statement of facts or a correct transcript of the evidence; furthermore, such agreed statement of facts or correct transcript of evidence must be authenticated by the signatures of the parties or their attorneys. (Ill. Rev. Stat. 1983, ch. 48, par. 19(b).) The record before this court includes an authentication of the record of the arbitration proceedings, signed by attorneys for both parties, despite the absence of claimant's exhibit number 10. We believe the circumstances warrant remanding this cause to the Industrial Commission for rehearing on the single issue of medical expenses, subject to a maximum award of $7,241.09. See *Gray Hill, Inc. v. Industrial Com.* (1986), 145 Ill. App. 3d 371, 378, 495 N.E.2d 1030, 1036.

For the foregoing reasons, the judgment of the circuit court of Vermilion County is reversed; the Industrial Commission's award of temporary total disability compensation of $112.48 per week for $89^2/7$ weeks is reinstated; and the cause is remanded to the Industrial Com-

mission for rehearing on the issue of medical expenses, subject to a maximum award of $7,241.09.

Circuit court reversed; Industrial Commission affirmed in part, remanded in part with directions.

BARRY, P.J., and McCULLOUGH, McNAMARA, and WOODWARD, JJ., concur.