DENNIS FRIGO, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Kelly Beverly Plumbing, Appellee).

First District (Industrial Commission Division)   No. 1—89—2859WC

Opinion filed June 8, 1990.

Stevenson, Rusin & Friedman, of Chicago (John A. Maciorowski, of counsel), for appellant.

Wiedner & McAuliffe, Ltd., of Chicago (Michael F. Doerries, of counsel), for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Petitioner, Dennis Frigo, sought worker's compensation benefits following a knee injury sustained while working for respondent, Kelly Beverly Plumbing. An arbitrator awarded no benefits after finding that, although a work-related accident had occurred, no disability resulted, and the present condition of ill-being was the result of a non-work-related accident which occurred 16 months later. The Commission upheld the arbitrator's decision in all respects, except that it awarded medical costs for services rendered within a few weeks after the accident. The circuit court confirmed the Commission's decision. Petitioner appeals, contending the Commission's decision is against the manifest weight of the evidence.

Petitioner worked as a plumbing superintendent for respondent. On August 14, 1986, petitioner and another man were carrying a 150-pound box when petitioner tripped, striking his left knee on concrete. The box fell on his legs. Petitioner was in "excruciating pain, I was screaming for about it seemed like eternity ***." He did not work the remainder of the day. That evening he noticed swelling, pain, and a weakness in the leg. He did not seek medical care that day. On August 15, 1986, petitioner saw Dr. Connell. Petitioner testified that Dr. Connell told him to return to work and "take it easy if you could."

Dr. Connell's findings were negative. X rays were also negative. Dr. Connell diagnosed a left knee contusion and recommended that petitioner take aspirin, consider an orthopedic evaluation, and return to work.

A Palos Community Hospital worker's compensation report dated August 15, 1986, states all tests were negative except for "mild supra-patellar joint effusion" and "tender over left medial knee cap area." Petitioner refused drugs and a knee brace. He was released for light work "for 2 days, rest if possible."

On the following work day, petitioner returned to work. On August 28, 1986, Dr. Farrell, an orthopod, examined petitioner. He recommended that petitioner continue to watch the knee and, if there was no improvement in a month, have an arthroscopy performed. Petitioner did not return to Dr. Farrell or to any other physician for medical treatment. Petitioner testified that he did not elect to have the arthroscopy because "I don't like being cut. I don't like visiting doctors."

Petitioner continued to work for the next 16 months. His job duties required him to perform "active" plumbing duties several times a week. This required squatting down, kneeling and standing. He noticed "a stiffness in the knee," and some pain and swelling. The

symptoms "never completely" went away. Petitioner missed no work during this time. He did complain to his supervisor and respondent's owner, Richard Kelly, "periodically," such as when the weather would change.

From October 1986 through January 1987, and from October 1987 through January 1988, petitioner participated in pheasant and water fowl hunting seasons. Pheasant hunting required walking through fields which were not level. He usually hunted every weekend. After hunting, he noticed swelling, grinding and crunching in his knee.

On January 3, 1988, petitioner was pheasant hunting in a field on snowy, frozen ground. "As I was walking *** my [left] knee gave out on me." Petitioner described the incident: "It gave out on me and I went down. When I went down, it felt like I fell in a hole, but there was no hole there." He noticed "excruciating pain." It was "just about the same pain" that he had experienced 16 months earlier, in August 1986. Petitioner "tried walking and then it buckled up on me and I figured something was wrong." He returned to the truck and rested while the others continued hunting.

On January 4, 1988, petitioner sought medical treatment at Palos Community Hospital. A hospital form filled out at 10:15 a.m. states "fell in a hole." The hospital report includes typewritten information taken down at 10:33 a.m., and states petitioner's "chief complaint" is: "(L) Knee Injury/Fell in a Hole." The nurse's notes written at 11:45 a.m. reads: "male [states] he fell in a hole 1-3-88." The examining physician's notes made at about 1:25 p.m. state petitioner complained of "falling in hole with left leg and twisting left knee."

He complained of pain and weakness in the knee. The examination revealed forward flexion with pain; mild to moderate effusion; tenderness; discoloration from the left knee to the foot; and pain with ambulation. X rays revealed a supra-patellar joint effusion. The diagnosis was left knee joint effusion with 2-degree blunt trauma. Petitioner's left knee was placed in a knee immobilizer, and he was given crutches. Petitioner did not return to work. Petitioner testified that he did give a history to the admitting nurse, but denied reporting that he fell in a hole, twisting the left knee the previous day.

On January 6, 1988, petitioner saw Dr. Basel I. Al-Aswad, an orthopedic surgeon. In a May 19, 1988, evidence deposition, Dr. Al-Aswad testified:

> "He gave me a history of his past problems dating back to 1986 when he had a possible meniscal tear and he gave me the history that he had given to Dr. Farrell, but there was a new history in that he was out hunting three days prior to him see-

ing me and his knee gave out on him and it swelled up. But he denied any significant trauma at that time, any new injury or twisting trauma."

Dr. Al-Aswad testified that there was "a discrepancy between the history given to me and the history that's on the chart for [January 3, 1988] in the emergency room."

Dr. Al-Aswad observed effusion, or fluid, of the left knee, tenderness and limited range of motion. Dr. Al-Aswad aspirated 40 cc's of a bloody fluid from the knee. The excess fluid could have been the result of a twisting incident of the knee. Dr. Al-Aswad testified on cross-examination that the presence of the fluid indicated a recent injury. Fluid accumulates "very rapidly" after trauma. If the knee gave out, petitioner could then have twisted it and fallen. While there was mild effusion seen in August 1986, "[b]y the time he saw me, it just started to accumulate, it became much worse."

On January 13, 1988, petitioner again saw Dr. Al-Aswad, complaining of pain and inability to bear weight on his left leg. On January 18, 1988, Dr. Al-Aswad performed an arthroscopy. During surgery, he observed Grade II chondromalacia, and synovial hypertrophy, *i.e.*, marked swelling and inflammation of the synovial lining. There was no ligament tear, and no meniscal tear. Dr. Al-Aswad also noted a mild anterior cruciate ligament strain. This condition could have resulted from a twisting incident, or a fall or a variety of incidents. The chondromalacia could occur to "a person who uses his knees a lot in bending." It can be caused by trauma and can be aggravated by the type of trauma petitioner suffered in August 1986.

Dr. Al-Aswad testified that the negative findings noted by Dr. Connell in August 1986 suggested that no anterior cruciate instability existed, and no collateral ligament instability existed, after the work accident. The lateral collateral ligament tenderness which Dr. Al-Aswad observed was a new finding compared to the August 1986 examinations. However, "it may be new, but I don't think it's that significant from that point of view." The tenderness and effusion could result from a twisting incident. On May 4, 1988, Dr. Al-Aswad released petitioner for work.

At the May 19, 1988, evidence deposition, Dr. Al-Aswad opined, in answer to a hypothetical question, that petitioner's present condition was "most likely related to an earlier dat[ed] injury rather than to an acute recent injury, so that it's related to the original one in '86."

At a May 18, 1988, evidence deposition, Dr. James Ryan, an orthopedic surgeon, testified that on May 13, 1988, he examined petitioner at respondent's request. In answer to a hypothetical question

which included the fact that the patient experienced "pain and grinding" in his knee during the 16-month period, Dr. Ryan opined that the January 18, 1988, surgery was necessitated by the hunting incident of January 3, 1988, and not the August 1986 work incident. The effusion seen in January 1988 was the result of a new injury. "[B]loody fluid in a situation like that is a fresh injury ***." The bloody fluid would not exist over a 16-month period and was the result of a recent injury. Moreover, the "giving way and locking and swelling *** was something relatively recent." A twisting incident could cause pain, inflammation, irritation of the lining of the joint capsule and cause the knee to give way.

Dr. Ryan testified further that the chondromalacia seen during surgery was the result of age and overuse. A traumatic episode like the August 1986 accident would not produce Grade 2 chondromalacia. Instead, it would have to produce "a real significant chondromalacia. Probably a Grade 4, a real crack." If the August 1986 accident had caused the chondromalacia, there "would have been a much more significant type of lesion." Moreover, chondromalacia, which is a degenerative process of the articular cartilage in the knee, is not considered a classical cause of a knee collapsing. The August 1986 incident could have aggravated a preexisting chondromalacia condition. But the condition "in a man of this age is quite common."

At the June 9, 1988, hearing, petitioner called Richard Kelly, respondent's president and owner, to testify. The arbitrator permitted the testimony over respondent's objection that Kelly's name had not been included on the list of petitioner's witnesses.

Kelly testified that between August 14, 1986, and January 1988, petitioner complained about his left knee approximately once each week. Kelly noticed him limping from time to time, "mostly [on] the left leg." On May 9, 1988, petitioner had returned to work as a supervisor.

The arbitrator denied all benefits, finding that petitioner failed to prove that he sustained any disability on account of the work accident.

The Commission found no causal relationship between the August 14, 1986, accident and the condition of ill-being which required medical services after January 3, 1988. The Commission relied on the fact that petitioner sought no medical treatment after August 28, 1986, and continued to work full time until January 4, 1988. The Commission pointed to the January 4, 1988, emergency room records indicating petitioner fell in a hole the previous day, while hunting. Finally, the Commission relied on Dr. Ryan's opinion that no causal connection

existed. The Commission did, however, award $125 in medical costs for treatment rendered prior to January 3, 1988, finding that those costs were causally related to the August 1986 accident.

The circuit court confirmed the Commission's decision, finding that it was not against the manifest weight of the evidence.

Petitioner contends that the Commission's decision is against the manifest weight of the evidence.

■■■ It is within the province of the Industrial Commission to determine questions concerning the credibility of the witnesses, the weight to be assigned to the evidence, causal connection, and the extent of disability. (*Berry v. Industrial Comm'n* (1984), 99 Ill. 2d 401, 459 N.E.2d 963; *Neal v. Industrial Comm'n* (1986), 141 Ill. App. 3d 289, 490 N.E.2d 124.) A court may not disregard permissible inferences drawn from the evidence by the Commission merely because other inferences might have been drawn. (*Long v. Industrial Comm'n* (1979), 76 Ill. 2d 561, 394 N.E.2d 1192.) Where expert medical opinions differ, the Commission must determine the weight to be given to those opinions. (*Zarley v. Industrial Comm'n* (1981), 84 Ill. 2d 380, 418 N.E.2d 717; *Long v. Industrial Comm'n*, 76 Ill. 2d 561, 394 N.E.2d 1192.) Moreover, questions of whether a preexisting condition has been aggravated concern primarily medical questions, and a finding of fact by the Commission based on medical testimony should be given substantial deference. (*Berry v. Industrial Comm'n*, 99 Ill. 2d 401, 459 N.E.2d 963; *Long v. Industrial Comm'n*, 76 Ill. 2d 561, 394 N.E.2d 1192.) We will not disturb the Commission's findings on these questions of fact unless they are against the manifest weight of the evidence. *Berry v. Industrial Comm'n*, 99 Ill. 2d 401, 459 N.E.2d 963; *Smith v. Industrial Comm'n* (1987), 161 Ill. App. 3d 383, 512 N.E.2d 712.

■■ In the present case, the Commission was entitled to conclude that the August 14, 1986, accident produced no disability after August 28, 1986. Petitioner's examining physician, Dr. Connell, noted that all findings were negative. He recommended aspirin. Petitioner did not need surgery, crutches, medication, or a knee support. He did not miss work. He could walk and engage in everyday activities. During that time, he participated in two full hunting seasons, which required periods of sitting, standing and hiking in cold weather on hard, uneven terrain. At work he performed physical labor in helping the employees with their plumbing tasks. In fact, petitioner continued working for 16 months without complaint to a physician. While petitioner did see Dr. Farrell on August 28, 1986, he never returned for any follow-up treatment.

Dr. Ryan opined that no causal relationship existed between the work accident and the subsequent need for surgery in 1988. Dr. Ryan also stated that the fluid indicated a recent trauma had occurred. The chondromalacia was common in men of petitioner's age.

Dr. Al-Aswad testified that the negative findings by Dr. Connell's earlier examination indicated that some of the conditions observed during surgery in January 1988 did not exist in August 1986. Dr. Al-Aswad also found the tenderness over the lateral collateral ligament was a new finding, and the tenderness could result from a twisting incident. Dr. Al-Aswad admitted on cross-examination that the bloody fluid on the knee indicated that a new injury or trauma had occurred.

Petitioner points to Dr. Farrell's August 28, 1986, recommendation that petitioner consider an arthroscopy if his condition did not improve in a month. Petitioner, however, never returned to Dr. Farrell. The mere fact that he did undergo an arthroscopy 16 months later is not sufficient to require the Commission to find a causal connection between the condition of the knee at that time and the August 1986 accident.

■ Petitioner argues that the evidence does not support a finding that *any* accident occurred in January 1988. However, the Commission could properly find that the history given by petitioner at the emergency room was correctly recorded as reported by petitioner. The hospital records filled out by four different people at four different times over a four-hour period repeatedly indicate that petitioner reported falling in a hole.

Interestingly, two months later, on March 16, 1988, Dr. Al-Aswad noted that petitioner was anxious about what history he had previously given. Dr. Al-Aswad observed that petitioner had a previous problem and was out hunting and had been injured prior to an initial visit of January 4, 1988.

■ Petitioner's argument that section 16 of the Act mandates exclusion of the hospital records is without merit. (See Ill. Rev. Stat. 1987, ch. 48, par. 138.16 (medical records are not "conclusive proof of such matters").) Notably, it was petitioner who introduced the hospital records into evidence.

■ Petitioner relies heavily on the testimony of Kelly, respondent's owner, that petitioner complained of knee problems intermittently during the 16-month period before January 1988. In view of the medical evidence, however, that testimony does not compel a finding that a new, non-work-related injury did not occur on January 3, 1988. Significantly, Dr. Ryan considered the fact that petitioner complained of knee problems throughout the 16-month period. It did not alter his

opinion that no causal connection existed between the August 1986 accident and the condition of the knee in January 1988.

The Commission was entitled to find that Kelly's brief testimony provided only vague confirmation that petitioner experienced some difficulty. It did not detract from the fact that the condition of his knee did not interfere with petitioner's work duties, that the knee required no medical attention until January 1988, and that the medical findings at that time were significantly different than the August 1986 medical findings.

Petitioner also relies on Kelly's testimony that petitioner telephoned in January 1988 and said "that he had problems with his leg, and that he wouldn't be able to come in to work," and that petitioner had reported that the leg "collapsed." The Commission need not have found this tends to indicate one way or the other whether the leg "collapsed" when petitioner stepped in a hole.

For the foregoing reasons, the judgment of the circuit court of Cook County, confirming the Industrial Commission's decision, is affirmed.

Judgment affirmed.

BARRY, P.J., and WOODWARD, McCULLOUGH, and LEWIS, JJ., concur.