AMOCO OIL COMPANY, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Robert J. Kampert, Appellee).

First District (Industrial Commission Division)   No. 1—90—3437WC

Opinion filed August 16, 1991.

Rooks, Pitts & Poust, of Chicago (Daniel Socha and Susan Clancy Boles, of counsel), for appellant.

Van Duzer, Gershon, Jordan, Petersen & Loeffler, of Chicago (Warren G. Petersen, of counsel), for appellee.

JUSTICE LEWIS delivered the opinion of the court:

Claimant, Robert J. Kampert, filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Ill. Rev. Stat. 1981, ch. 48, par. 138.1 *et seq.*) (the Act) for an injury to his lower back and for psychological injury resulting from a work-related accident on March 4, 1981, while in the course of his employment with the respondent, Amoco Oil Company. After a hearing before an arbitrator, the claimant was awarded benefits for permanent and total disability and medical benefits of $25. On review, the arbitrator's decision was affirmed by the Industrial Commission (Commission) and confirmed by the circuit court. The respondent appeals.

On appeal, the respondent contends that the Commission's decision that the claimant's condition of ill-being was causally connected to his work accident of March 4, 1981, and the Commission's award of permanent and total disability were against the manifest weight of the evidence. Alternatively, the respondent argues that the Commission's decision of permanent and total disability was premature given the arbitrator's finding, which was adopted by the Commission, that the claimant needed psychiatric treatment and vocational rehabilitation, and that this cause should be remanded to the Commission for proceedings on this finding. Before considering these issues, a statement of the facts is necessary.

The claimant testified that he had not graduated, but he had completed 1½ years of high school. His work history consisted of being a construction laborer, and for the last 17 years, he had driven a gasoline delivery truck for the respondent. At the time of his accident, he was 43 years of age.

The claimant stated that he had urological problems since 1974 for which he had extensively sought treatment. In August 1976, the claimant was involved in a car accident in which he was rear-ended by another car while stopped at a train crossing. As a result of the car accident, he injured his neck and back. Following the car accident, the claimant was off work from June 1978 through December 1980, at which time the respondent's doctor released him to return to work.

When the claimant returned to work on January 5, 1981, he worked at his regular job for the next two months, until March 4, 1981. On that date, the claimant was delivering gasoline as his job required. While delivering gasoline at a new location, he had to move some 50-gallon barrels, which were filled with sand or gravel, that were in his way. When moving one of the barrels, the claimant slipped, and he immediately felt

a sharp pain in his back, in his neck, and down his legs. The claimant finished his delivery, returned the truck to the respondent's place of business, and went home. Approximately a week later, the claimant saw the respondent's doctor, Dr. Massarik. Dr. Massarik sent him to an orthopedic doctor. Since his accident on March 4, 1981, the claimant had not returned to work for the respondent or sought other employment. However, he admitted he did tasks around his home, such as mowing the lawn, washing dishes, and painting the house. At the time of the arbitration hearing, the claimant continued to complain of pain in both legs, of numbness in his legs, and discomfort in his neck and back.

On cross-examination, the claimant testified that he had served only nine months in the Army. A month after he saw a psychiatrist or psychologist in the service, he was discharged. According to the claimant, he had initially seen the Army doctor for stomach complaints. In a history given by the claimant to Dr. Young at Northwest Community Hospital following his car accident in 1976, the claimant told of having suffered from depression and irritability for two years prior to the accident.

The claimant's wife testified that prior to the claimant's car accident of 1976, he worked at his job approximately 10 hours a day, five days a week. She described the claimant as hardworking and conscientious about his work. After the 1976 car accident, the claimant was in pain, which slowed the claimant down in doing the tasks he normally did. According to Mrs. Kampert, when the claimant returned to work in January 1981, he was almost completely "back to normal," and the claimant again worked 8 to 10 hours a day, five days a week. Mrs. Kampert stated that after the work accident of March 4, 1981, the claimant became very agitated, short-tempered with people, and bitter. She testified that prior to 1976, the claimant had not been depressed.

Dr. Massarik, respondent's company physician, testified in his evidence deposition that he first saw the claimant in the spring of 1977. At that time, the claimant complained of back problems, which prevented the claimant from returning to work. The next time Dr. Massarik saw the claimant was on December 23, 1980, to determine if the claimant was able to return to work. Dr. Massarik stated that he considers a person's emotional state as part of his evaluation of a person. Dr. Massarik was aware that the claimant had seen other doctors between 1977 and 1980, and he had seen their reports. He was aware that the doctors had found the claimant physically normal but that the doctors had felt the claimant was depressed, nervous, anxious, angry, and hostile. At his December 1980 examination of the claimant, Dr. Massarik determined that

the claimant was normal and that he was able to return to his regular duties.

Dr. Massarik saw the claimant again on March 10, 1981, following the claimant's work-related accident. At that visit, the doctor found that the claimant walked with a stiff, halting gait and that he was unable to bend over and touch his toes. The claimant also complained of pain in his back. The doctor stated that the claimant's gait was one of a person in pain. Dr. Massarik's impression of the claimant's condition was that the claimant had a questionable lumbar sprain, but he referred the claimant to an orthopedic surgeon, Dr. Proctor Anderson.

After March 10, 1981, Dr. Massarik talked to the claimant on the telephone from time to time. He next saw the claimant on July 21, 1981. Dr. Massarik found that the claimant's back sprain had subsided but that the claimant still complained of back pain. In addition, the claimant was nervous and agitated. On each occasion that the doctor talked to the claimant following the March 1981 accident, either by telephone or in person, the claimant was very upset, angry, and hostile. The claimant could not understand why none of the doctors he had seen were able to relieve his pain. At the July 1981 visit, Dr. Massarik decided that the claimant could not safely return to work as a truck driver because of his emotional instability. However, Dr. Massarik testified that he believed the claimant was capable of working at a job which was not potentially hazardous to himself or others, such as physical work.

Dr. Massarik again saw the claimant on February 4, 1982, and in his opinion, the claimant continued to be unable to work due to his emotional instability. Dr. Massarik had no opinion as to whether the claimant's psychological condition was causally related to his work-related accident of March 4, 1981; however, Dr. Massarik agreed that muscular aching can be a symptom of depression and that pain can precipitate or aggravate a depressive condition.

A letter from Dr. Proctor Anderson, an orthopedic surgeon, established that he had seen the claimant on March 19, 1981. Based upon his examination of the claimant, it was his impression that the claimant suffered from degenerative lumbar disc disease but that the claimant did not have a herniated disc. His recommended treatment for the claimant was bed rest for two weeks, prescribed medication, and no lifting of heavy objects in the future.

Various medical reports were admitted into evidence regarding claimant's mental and physical status from the time of the 1976 car accident until the claimant's work-related accident of March 1981. The discharge summary from Northwest Community Hospital dated December 14, 1976, disclosed that the claimant had no evidence of neurological de-

ficiency but that there was mild scoliosis and some anterior spurring at the L4-L5 vertebrae. A history taken at Northwest Community Hospital stated that the claimant had stress over his job and his accident and that the claimant was quite nervous. It was reported that the claimant had some irritability and depression for the past two years. The doctor's final diagnosis and impression at the time of the claimant's discharge from Northwest Community Hospital was low back strain related to trauma and life stress, peripheral neuropathy, chronic depression, and chronic bronchitis.

Dr. William Kernahan, Jr., stated in a letter report that he had seen the claimant on August 1, 1977. His examination of the claimant revealed a very angry person with considerable rigidity throughout his spine. Dr. Kernahan found that the claimant had paranoid ideas, and he advised the claimant to seek psychiatric help, but the claimant refused. Dr. Kernahan did not doubt that the claimant had back pain, but he found that the claimant also had other severe problems of an emotional nature which required psychiatric help. Dr. Kernahan's diagnosis of the claimant's condition was degenerative disc disease of the lumbosacral spine with anxiety state.

A report from the Chicago Rehabilitation Institute dated March 1978 disclosed that the claimant's affect was mildly agitated and depressed. The claimant complained at his visit that he had pain in his neck, shoulders, and back since August 1976, and that he had difficulty sleeping. The claimant was unsure if he could continue with his job. The claimant was also angry about his past medical treatment for his physical complaints. The claimant was given the Minnesota Multiphasic Personality Inventory (MMPI) test, the results of which indicated the claimant had a significant level of depression and a tendency towards self-doubt and anxiety. The impression of the doctor at the Chicago Rehabilitation Institute was that the claimant had marked anxiety syndrome plus subjective low back pain and mid-back pain. The report recommended that the claimant seek psychological services.

In 1979, the claimant went to Mayo Clinic. Reports from Mayo Clinic revealed that the claimant's history was suggestive of a thinking disorder. The clinic doctors found that the claimant tended to exaggerate his symptoms and complaints and that he had a poor self-concept. The claimant was observed to be angry, dissatisfied with his family life, restless or agitated, severely depressed, worrying and pessimistic, immature, egocentric, suggestible and demanding, and prone to develop circumscribed functional complaints such as headaches and backaches. The doctors stated that the claimant lacked insight and probably was unlikely to accept a psychological explanation of his symptoms.

Progress notes from the Hines Veteran's Administration Hospital (Hines) from 1980 indicated that the claimant reported that he was feeling depressed. During his hospitalization at Hines in February 1980, the claimant was given an MMPI, the results of which suggested hypochondriacao, autonomic nervous system overreactivity, lack of stamina, and oppression with paranoid traits.

In addition to these medical reports of the claimant's mental and physical status prior to his March 1981 accident, numerous depositions and reports completed after March 1981 were admitted. A medical report done by Dr. Scarff at Foster McGaw Hospital in June 1981 gave Dr. Scarff's final diagnosis of the claimant's condition as low back pain, etiology undetermined.

Ellen Grant Calderini, a psychotherapist, testified in her evidence deposition that she had seen the claimant on April 15, 1982, at Dr. Lauer's request. As a psychotherapist, it was her job to assess an individual's personality structure. She found the claimant uncooperative, defensive, negative, and a narcissistically injured man, *i.e.*, a person who feels the world owes him a living. At the claimant's interview, he had "shaky" hands and some agitation. She also conducted various tests, some of which were refused by the claimant. One test, the Wechsler Adult Intelligence Scale (WAIS), placed the claimant's intelligence on the bright-to-normal scale. Some subtests of the WAIS indicated that the claimant had very good mechanical ability.

Calderini stated that the claimant blamed his accident of 1976 for his problems. She determined that the claimant's condition developed prior to the age of five, that he was very fearful and anxious about what might happen, and that he clung to a very rigid kind of moralistic code. She further found that he had a lifelong condition and that the claimant did not have the ego strength to make his way through life. She testified that the smallest incident which would be mildly upsetting to a healthy person was absolutely devastating to the claimant. It was her opinion that the claimant's condition was not causally connected to or aggravated by his work-related accident on March 4, 1981.

Calderini agreed that the claimant's accident in 1976, which disabled him for a long period of time, could have had a material effect on an existing narcissistic personality, and similarly, so could the accident in 1981. Calderini determined that the claimant was unable to work as a truck driver in 1982 due to his emotional state; however, she believed he was capable of performing some type of work involving mechanical skills. She agreed with Dr. Garron that the claimant's multiple physical complaints were a manifestation of his emotional disturbance. It was also her opinion that the claimant was malingering.

Dr. John Lauer, a psychiatrist, testified in his evidence deposition that he saw the claimant, at the respondent's request, on April 15, 1982, and on May 4, 1982. He found that the claimant's thought processes were intact, and that there was no evidence of organic brain pathology. His diagnosis of the claimant's condition was dysthymic disorder, *i.e.*, a tendency to be depressed, a low-grade chronic condition that was present at all times but varied in degree of severity, and that the claimant also suffered anxiety which also varied in severity. Dr. Lauer believed that the claimant had this condition prior to 1981. It was Dr. Lauer's opinion that the claimant could not drive a truck because of his psychological condition but that the claimant could do something mechanical. It was also Dr. Lauer's opinion that the claimant's condition was not causally connected to his accident of 1981. On cross-examination, the doctor agreed that the 1981 accident "might" have aggravated the claimant's emotional state by reason of the pain that he suffered from the accident.

The claimant again saw Dr. Lauer of his own accord on April 18, 1983, and April 27, 1983. At these visits, the claimant complained about his neck, his lower back, his testicles, and his abdomen. Dr. Lauer's opinion of the claimant's condition in 1983 was the same as it was in 1982.

Dr. Kysar, another psychiatrist, testified in his evidence deposition that he had seen the claimant on March 1, 1984. He found the claimant to be intensely despondent, irritable, angry, and without much variation in his affect. In addition, the claimant was preoccupied with various physical symptoms. He testified that the claimant considered himself useless and inadequate, had a loss of self-esteem and self-respect, and did not see an end to his problems. His diagnosis of the claimant's condition was depressive neurosis (another name for dysthymic disorder), chronic and severe. In his opinion, the claimant's accident of 1981 contributed to or aggravated the claimant's psychiatric illness, and the claimant's condition was probably permanent.

Dr. Kysar found that the claimant's condition had been present for a long time, that "apparently [claimant] had some psychiatric problems going on for quite a while, they were made worse in 1976, apparently they got somewhat better in 1980 to '81 *** then they were made worse again by the incident in March, 1981." Dr. Kysar based his opinion on the fact that the claimant returned to work. He stated that if the claimant returned to work in 1981 there must have been a considerable improvement emotionally as well as physically, otherwise the claimant could not have done so. He found that there was a similarity to the claimant's problems before and after the 1981 accident, but that the

claimant was much worse after the 1981 accident. Because of the long-standing nature of the claimant's condition, it was his opinion that treatment would not produce a significant improvement. He did not believe the claimant could return to work as a truck driver or that the claimant could return to any type of work due to his psychological condition.

A letter report from Dr. Matz dated July 18, 1984, indicated that he had seen the claimant on that date. At the claimant's visit, his complaints were diffuse and not well-localized. Dr. Matz reported that the claimant's long-standing subjective complaints were devoid of findings of physical impairment, and from a physical standpoint, the claimant was employable. Dr. Matz determined the claimant's condition to be a temporary aggravation of a preexisting degenerative disc disease.

A medical report dated January 16, 1985, from Northwest Community Hospital indicated that the claimant had come to the emergency room very nervous and depressed. Dr. Moskovic, a consulting doctor at the hospital, found the claimant to be angry, to have an embittered affect, and to be frustrated with his medical treatment over the years. Dr. Moskovic reported that there were no physical explanations for the claimant's symptoms but that the claimant's association and thought processes were impaired and his judgment highly questionable. The doctor did not believe the claimant to be malingering. His diagnosis of the claimant's condition was that the claimant had a major affective disorder, nonspecific in nature; a possible somitization or psychophysiological disorder; and chronic pain syndrome. Dr. Moskovic found the claimant's situation to be complex with qualified psychological and physical problems. He determined that he was dealing with a psychogenic process and that the claimant's denial was extreme. Furthermore, the doctor determined that it would be difficult to reverse the process that had been there for such a long time.

Dr. David Garron, a psychologist, saw the claimant on April 26, 1985, at the respondent's request. He reviewed the claimant's records and gave the claimant the Peabody Picture Vocabulary test, the results of which indicated that the claimant's intelligence was below average to average. Dr. Garron's review of the claimant's records indicated that the claimant was suffering a psychiatric disorder before March 1981. Dr. Garron gave the claimant a back pain classification scale, and this test reflected that the claimant's physical illness was a reflection of his psychological disturbance and that the disorder was chronic and long-standing. He stated the claimant's condition went back to late adolescence or early adulthood.

Dr. Garron disagreed with the diagnosis of depressive neurosis. In his opinion, the claimant had a moderate-severe personality disorder. He

did not believe that the claimant's accident of 1981 caused or aggravated his psychological condition. However, Dr. Garron admitted that the 1981 accident did play a role in that the claimant's psychological makeup was such that he is chronically vulnerable to decompensations and, episodically, the claimant fastens onto events which justify other wrongs in his life. He believed that the claimant was just as capable to work now as he ever was, from a psychological point of view, and that the claimant was capable of driving a truck. Dr. Garron agreed that physical trauma can aggravate a preexisting emotional condition.

Lastly, the medical records from Humana Hospital of June 21, 1985, indicated that the claimant was admitted to the hospital with complaints of a severe state of agitation, restlessness, loss of appetite, and difficulty with concentration. It was found that "[f]rom an emotional standpoint, the patient is markedly deteriorated." The diagnostic impressions given were depression associated with anxiety with multiple somatic complaints, and chronic long-standing cervical and lumbosacral myoligamentous pain with significant psychological overlay.

After considering this evidence, the arbitrator found that the claimant had a long-standing emotional problem of depression and that various doctors had recommended psychiatric treatment to the claimant throughout the years, but that the claimant had never followed those recommendations. Further, in spite of this condition, the claimant had married, had children and had fulfilled his responsibilities to his wife, children, and employer. The arbitrator found that, in 1976, the claimant had a car accident in which he received injuries to his upper and lower back. The claimant was off work for these injuries, and during this time, the doctors again recommended psychiatric treatment, but the claimant did not follow the recommendations. The arbitrator found that the claimant returned to work in 1981, at which time the claimant was well motivated and physically able to return to work. However, following his work-related accident on March 4, 1981, the depressive neurosis from which the claimant had suffered now completely disabled him. The arbitrator determined that no market existed for a person in the claimant's physical and emotional condition and with the claimant's lack of skills. The arbitrator held that the claimant's condition of ill-being was causally connected to his work-related accident of March 4, 1981, and found the claimant to be permanently and totally disabled. As was noted previously, the Commission affirmed the arbitrator's decision and the circuit court confirmed the Commission.

The first issue raised by the respondent is that the Commission's finding that the claimant's psychological condition was causally connected to his accident of March 4, 1981, was against the manifest

weight of the evidence. The respondent argues that the claimant's mental condition was long-standing, and thus, his condition of ill-being was not causally related to his employment. The respondent's argument rests upon Dr. Lauer's, Dr. Garron's, and Ellen Calderini's opinions that his psychological condition was not caused by his work accident.

■ It is well settled that it is the province of the Industrial Commission to determine witness credibility, to resolve conflicts in the medical evidence, and to determine causal connection between a claimant's disability and the work-related accident. (*McDaniel v. Industrial Comm'n* (1990), 197 Ill. App. 3d 981, 557 N.E.2d 212; *May v. Industrial Comm'n* (1990), 195 Ill. App. 3d 468, 552 N.E.2d 258.) In addition, a disability caused by a neurosis is compensable if it resulted from an accidental injury. (*Veritone Co. v. Industrial Comm'n* (1980), 81 Ill. 2d 97, 405 N.E.2d 758; *Smith v. Industrial Comm'n* (1987), 161 Ill. App. 3d 383, 512 N.E.2d 712.) The work-related accident need not be the sole causative factor of the neurosis but need be only a causative factor of the condition. (*Smith*, 161 Ill. App. 3d 383, 512 N.E.2d 712.) Further, even where the psychological condition was a preexisting one, if the work-related accident aggravated the condition, it is compensable. (*Smith*, 161 Ill. App. 3d 383, 512 N.E.2d 712.) Because it is the province of the Commission to determine causal connection, a reviewing court will not overturn a Commission's determination if the Commission's decision is not against the manifest weight of the evidence. *McDaniel*, 197 Ill. App. 3d 981, 557 N.E.2d 212.

■ In the case *sub judice*, the evidence established that the claimant did have a preexisting psychological condition of depression; however, the claimant never underwent psychiatric treatment, and his condition was not so disabling as to prevent him from working for the respondent for 17 years. Although the claimant's accident in 1976 may have exacerbated his psychological condition, the evidence demonstrated that the claimant's condition had improved and that he was capable of returning to his work in January 1981. The claimant worked his normal job for two months without problems, either psychologically or physically, until his accident of March 4, 1981, but, after this accident, the claimant deteriorated mentally.

The evidence is not disputed that the claimant did suffer a physical injury on March 4, 1981. However, the medical evidence of whether the claimant's psychological injury resulted from this accident is clearly conflicting. Ellen Calderini found that the claimant's condition had existed since he was very young and that the smallest incident which was mildly upsetting to a healthy person was devastating to the claimant. It was her opinion that the claimant's condition was not caused or aggravated

by his work-related accident of 1981 and that the claimant was malingering. Dr. Garron, a psychologist, found the claimant to be suffering from a long-standing personality disorder, and in his opinion, the claimant's work-related accident did not cause or aggravate the claimant's mental condition. He admitted that the claimant was emotionally chronically vulnerable and that a physical trauma can aggravate a preexisting emotional condition. Dr. Lauer, respondent's psychiatrist, found the claimant's dysthymic disorder to be a long-standing condition. It was also Dr. Lauer's opinion that the claimant's condition was not causally connected to his work-related accident, but he agreed that the claimant's accident of 1981 might have aggravated his emotional state because of the pain the claimant suffered from the injury. Dr. Kysar's diagnosis of the claimant's condition was the same as Dr. Lauer's; however, Dr. Kysar determined that the claimant's condition was causally connected to his work-related accident. Dr. Matz, whose specialty was undisclosed, found the claimant employable from a physical standpoint but expressed no opinion regarding the claimant's psychological condition. Lastly, the respondent's physician, Dr. Massarik, gave no opinion on causal connection, but he determined that the claimant's emotional condition following his work-related accident prevented the claimant from returning to work. Dr. Massarik had not found the claimant incapable of working because of his emotional condition prior to that time. Thus, the medical evidence on causal connection was conflicting, but there was evidence that the claimant's accident of March 4, 1981, was a causative factor in aggravating his preexisting emotional condition, and we cannot conclude that the Commission's determination was against the manifest weight of the evidence.

The respondent also contends on appeal that the Commission's finding that the claimant was permanently and totally disabled was against the manifest weight of the evidence. The respondent argues that the medical evidence presented in this case established that the claimant was physically able to work. Further, the respondent asserts that the testimony of Dr. Garron, Dr. Lauer, and Ellen Calderini was that the claimant was capable of gainful employment from a psychological standpoint as well. Therefore, the respondent contends that the claimant failed to sustain his burden of proof that he was permanently and totally disabled.

■ The determination of the extent or permanency of an employee's disability is a question of fact to be made by the Commission, and on review, the Commission's decision will not be overturned unless it is against the manifest weight of the evidence. (*Esposito v. Industrial Comm'n* (1989), 186 Ill. App. 3d 728, 542 N.E.2d 843.) It is the claim-

ant's burden to prove by a preponderance of the evidence the extent and permanency of his disability. (*Esposito*, 186 Ill. App. 3d 728, 542 N.E.2d 843.) To prove that a claimant is permanently and totally disabled, he must show that he cannot perform any services except those for which no reasonably stable labor market exists. (*Illinois-Iowa Blacktop, Inc. v. Industrial Comm'n* (1989), 180 Ill. App. 3d 885, 536 N.E.2d 1008.) Factors to be considered in making a determination of permanency include a claimant's age, training, education, and experience. (*Illinois-Iowa Blacktop, Inc.*, 180 Ill. App. 3d 885, 536 N.E.2d 1008.) Once a claimant has met this burden, the burden then shifts to the respondent to show that some kind of competitive market work is regularly and continuously available to the claimant. *Esposito*, 186 Ill. App. 3d 728, 542 N.E.2d 843.

■ In the case *sub judice*, the record contains sufficient evidence that the claimant is unemployable. The arbitrator, in her decision, stated that "[b]ased upon the Petitioner's age, limited verbal skills, lack of vocational mechanical knowledge and experience, as well as his physical and emotional condition, the Arbitrator finds his state of ill-being permanent." The record established that the claimant was 43 years of age at the time of the accident, that at most he had a tenth-grade education, and that he had worked for the respondent as a truck driver for the past 17 years. His prior work history was as a construction laborer. Dr. Massarik, the respondent's doctor, testified that the claimant could not safely return to work as a truck driver because of his emotional instability. Although Dr. Massarik stated that it was his opinion the claimant could work, he did not specify what job the claimant could do. Dr. Massarik concluded simply that the claimant could do work that was not potentially hazardous to himself or others. Both Ellen Calderini and Dr. Lauer testified that the claimant was unable to return to work as a truck driver, but both believed the claimant could do something "mechanical." Their opinions regarding the claimant's ability to do mechanical work were based upon test results which showed the claimant had an aptitude in this area and were not based upon any training the claimant had. Dr. Garron alone expressed the opinion that the claimant was capable of returning to his employment as a truck driver. Dr. Matz found the claimant employable from a physical standpoint, but he expressed no opinion regarding the claimant's employability from a psychological standpoint. Dr. Kysar's opinion was that the claimant was permanently disabled because of his psychological condition and that he was unable to work because of his disability. It was also Dr. Kysar's opinion that because of the long-standing nature of the claimant's condition, treatment would not produce a significant improvement. We do not find that the

Commission's award of permanent and total disability benefits was against the manifest weight of the evidence given the claimant's emotional condition, age, and lack of education and training.

The last issue raised by the respondent is that the arbitrator made a finding that the claimant needed vocational rehabilitation but that the arbitrator failed to enter an order consistent with this finding. Subsequently, the Commission adopted the arbitrator's findings, and it, too, failed to enter an order regarding vocational rehabilitation. The respondent argues that, because of this finding, the determination of permanent and total disability was premature as there was no order for vocational rehabilitation and that this cause must be remanded for proceedings on this finding. Further, the respondent asserts that because the claimant refused to be evaluated for vocational rehabilitation or to receive necessary psychiatric treatment and because the arbitrator found the claimant needed such in her findings, the claimant should not be allowed to refuse vocational rehabilitation, and the appropriate sanction is a suspension of compensation benefits.

The respondent also contends that section 8(a) of the Act (Ill. Rev. Stat. 1981, ch. 48, par. 138.8(a)) mandates vocational rehabilitation. We find that the respondent's argument is rather tortured in its reasoning. First, we find that section 8(a) does not mandate vocational rehabilitation. Section 8(a) states in pertinent part as follows:

> "The employer shall provide and pay for all the necessary first aid, medical and surgical services, and all necessary medical, surgical and hospital services thereafter incurred, limited, however, to that which is reasonably required to cure or relieve from the effects of the accidental injury. The employer shall also pay for treatment, instruction and training necessary for the physical, mental and vocational rehabilitation of the employee, including all maintenance costs and expenses incidental thereto." (Ill. Rev. Stat. 1981, ch. 48, par. 138.8(a).)

From the language of the statute, it is clear that section 8(a) does not require vocational rehabilitation *per se,* but the statute provides that if vocational rehabilitation is ordered, the respondent is liable for the payment of the vocational rehabilitation.

In the instant case, although a finding was made by the arbitrator that the petitioner needed vocational rehabilitation, an order for rehabilitation was not entered. In the various cases cited by the respondent, either an order for rehabilitation was entered by the Commission, or the Commission, after hearing evidence on the matter, found that vocational rehabilitation was not necessary. Therefore, none of the cases cited by the respondent are dispositive of the issue presented here. Further, our

research has not revealed any case where this precise issue has been raised.

■■ We find that the Commission did not err in failing to enter an order for vocational rehabilitation under the circumstances presented here. Before entering an order for rehabilitation, the evidence must show that rehabilitation is appropriate. In making the determination of whether rehabilitation is appropriate, certain factors must be considered. The factors favoring rehabilitation include (1) that the employee's injury caused a reduction in earning power and there is evidence rehabilitation will increase his earning capacity, (2) that the employee is likely to lose job security due to his injury, and (3) that the employee is likely to obtain employment upon completion of rehabilitation training. (*Phillips Getschow Co. v. Industrial Comm'n* (1988), 172 Ill. App. 3d 769, 527 N.E.2d 114; *Connell v. Industrial Comm'n* (1988), 170 Ill. App. 3d 49, 523 N.E.2d 1265.) Additional factors to be considered are the costs and benefits to be derived from the program; the employee's work-life expectancy; his ability and motivation to undertake the program; and his prospects for recovering work capacity through medical rehabilitation or other means. (*Phillips Getschow Co.*, 172 Ill. App. 3d 769, 527 N.E.2d 114; *Connell*, 170 Ill. App. 3d 49, 523 N.E.2d 1265.) The evidence presented here does not support that vocational rehabilitation would have been appropriate, as the record reveals the claimant was not amenable to rehabiliation. Additionally, there is no evidence that the claimant's mental disability would permit him to be gainfully employed even if he were retrained in a new occupation, and in fact, the evidence presented mitigates against such a finding. Dr. Kysar testified that the claimant's condition was of such a long-standing nature that it was doubtful that treatment would benefit the claimant. Therefore, while the claimant may be physically qualified to receive vocational rehabilitation, it is far from certain that his mental disability would allow him to return to gainful employment even with vocational rehabilitation.

For the foregoing reasons, the judgment of the circuit court of Cook County confirming the Industrial Commission's decision is affirmed.

Affirmed.

McCULLOUGH, P.J., and McNAMARA, WOODWARD, and STOUDER, JJ., concur.