MARION LUDWIG, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Ottawa Industrial Sand Company, Appellee).

Third District (Industrial Commission Division)   No. 3—88—0852WC

Opinion filed September 26, 1989.—Rehearing denied February 5, 1990.

Mark A. Schindler and Peter F. Ferracuti, both of Law Offices of Peter F. Ferracuti, P.C., of Ottawa, for appellant.

Michael E. Rusin, of Stevenson, Rusin & Friedman, Ltd., of Chicago, for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Petitioner, Marion Ludwig, widow of the deceased employee Harold Ludwig, appeals from the Industrial Commission's (Commission's) denial of worker's compensation benefits for a fatal myocardial infarction decedent suffered allegedly as a result of his employment with respondent Ottawa Industrial Sand Company. An arbitrator found a causal connection between the death and the work activities and awarded petitioner $356.41 per week until the period of 20 years

has passed, or until $250,000 has been paid, whichever is greater, plus medical and burial expenses, and $9,440 for attorney fees. The Commission set aside the award, finding that petitioner failed to prove a causal connection. The circuit court of La Salle County confirmed the Commission's decision. Petitioner appeals, contending that the Commission's finding of no causal connection is against the manifest weight of the evidence.

Decedent worked as a maintenance foreman for respondent, where he had been employed for 25 years. Decedent's last day of work was September 10, 1983. He died of heart failure on the following day. No autopsy was performed.

Three major issues arose: whether decedent suffered stress as a result of increased work pressures several months before his death; whether decedent suffered stress from unusually heavy physical exertions the day before his death; and whether petitioner proved causal connection between either type of stress and decedent's death.

Witnesses for petitioner testified that from June through September 10, 1983, decedent carried extra responsibilities and suffered unusual stress at work.

Bob Savage, a co-worker, testified that during 1983 the maintenance employees had been doing more work with less manpower. Certain jobs had been eliminated, and the machinery broke down frequently. They were also short of men, especially during the week prior to decedent's death. Decedent had complained about these problems to Savage.

Russ Myers, a co-worker, testified similarly. Decedent was pushing himself very hard and complained that there was too much work. Some days decedent tried to help Myers on physical jobs, but decedent would "get real short winded and have to sit down." Myers saw such physical reactions once or twice a week.

Steve Hicks, a co-worker, testified that in September 1983 there were shortages and equipment shutdowns. Moreover, decedent assumed additional responsibilities because the other foreman was on vacation.

Donald Thompson, a maintenance clerk, gave a written statement to respondent that the week prior to his death, decedent was depressed and complained he did not feel he could do his job.

Petitioner testified that her husband was often fatigued during the six months prior to his death and complained of insufficient manpower at work. He worked six or seven days a week and was called to work at odd hours a dozen times during the last six months of his life. In the six weeks before his death, decedent worked four Saturdays.

Witnesses for respondent testified that from June through September 10, 1983, respondent's workload had not increased. David De-Coursey, a co-worker, testified that the work load in the maintenance department during the week prior to decedent's death was no different than it had been during the previous 13 years. David Kistenfeger, the supervisor of industrial relations, testified that there were more men working in September 1983 in relation to actual production than there were in 1985.

Witnesses for petitioner testified that on September 10, 1983, the day before his death, decedent exerted unusual physical efforts at work when he used an 80-pound pry bar to work on a 200- to 400-pound pump.

Savage testified that decedent showed an employee how to repair a pump, after which decedent sat down and said, "That's it, I can't do anymore." Decedent's face was drained of color, he was sweating, and his respiration was fast. Several months after decedent's death, Savage signed a statement written out by the personnel director stating that on September 10, decedent seemed relaxed and showed no discomfort after removing the plate from the pump.

Rod Miller, a general repairman, gave a written statement to respondent that decedent took the propeller out of the tank by himself on September 10 and that "he was grabbing hold of his chest that day and his breathing wasn't normal."

Joe Harper, a general repairman, gave a statement to respondent that on the afternoon of September 10, decedent was sitting in the weld shop and said he didn't feel very well.

Petitioner testified that on September 10, decedent came home from work and went right to bed, complaining of fatigue, pain in his stomach, and he had trouble catching his breath. He did not sleep well.

The September 11 emergency room report states that on that day decedent "collapsed at home after complaining of chest pain" and that he asked petitioner to call the rescue squad. Decedent died within an hour. The death certificate states that the cause of death was cardiopulmonary arrest due to acute arteriosclerotic heart disease.

According to the medical records, decedent suffered from several preexisting conditions. In 1971 he was hospitalized for coughing blood. In 1979, he was hospitalized for chest and arm pain and was diagnosed as having angina pectoris. In 1980, he saw Dr. Ghafoor for skipping heart beats. He also suffered from hypertension and had heart disease risk factors of cigarette smoking and a family history of

heart disease. On September 7, 1983, decedent saw Dr. Ghafoor and complained of pain in his upper abdomen and lower chest, an irregular heart beat, and coughing up blood. Decedent declined Dr. Ghafoor's recommendation that he be hospitalized for bronchial tests. Decedent also suffered from colon polyps and silicosis. There was no testimony that any of these factors alone caused his death, and many of the conditions were ruled out by all the doctors as having any possible connection with the cause of death.

In regard to causal connection, Dr. Robert Bettasso, a general surgeon, testified as an expert for petitioner that decedent's death was in part precipitated by the stressful work situation during the several months before his death, or by the reported physical exertions on September 10, 1983. Both the physical and the mental stress could cause myocardial infarct.

Dr. Albert O'Berto, a surgeon and petitioner's family doctor, testified similarly for petitioner. He stated that the months of stress and the September 10 incident could contribute to the myocardial infarction. Decedent had been under stress. The physical stress was the most obvious.

Dr. Louis McKeever testified as an expert for respondent regarding causal connection. He found the employment was not a "direct" cause of death because of the delay of one day between work and death. He also stated, however, that it is possible to suffer infarction one day and have the pain go away for some time. Dr. McKeever testified that the additional months of stress at work did not contribute to the heart problem because decedent had been doing the same basic job for many years. However, Dr. McKeever also testified that anxiety, frustration and emotional stress in the work environment could create an extra load on the heart.

Petitioner contends that the Commission's finding of no causal connection between decedent's death and his employment is against the manifest weight of the evidence.

■ The question of causal connection is one within the unique province of the Industrial Commission, and we will not disturb its finding unless it is contrary to the manifest weight of the evidence. *Cook v. Industrial Comm'n* (1988), 176 Ill. App. 3d 545, 531 N.E.2d 379.

The Commission found it particularly significant that Savage was impeached "by his statement three months after the alleged accident that Decedent was more relaxed that day than he had been previously and that he showed no sign of discomfort after knocking the plate off the pump. The Commission finds that Savage's testimony lacked cred-

ibility and that Petitioner failed to prove an onset of symptoms associated with Decedent's activities on September 10, 1983."

■■ Questions regarding a witness' credibility are generally left to the Commission to resolve. However, Savage was never impeached regarding the additional physical activities decedent performed the day before he died. In both statements, Savage said decedent exerted physical effort in removing the plate from the 200-pound pump. Thus the Commission's characterization of the impeachment is not quite accurate. The key fact was not impeached.

More importantly, several witnesses testified without contradiction that decedent performed this task on September 10, one day before his death.

The Commission also states that because of Savage's impeachment, petitioner failed to show an "immediate *** onset of symptoms after the September 10 exertion."

Several witnesses supported Savage's later statement that decedent showed signs of ill-health on September 10 and that decedent did heavy physical work that day. Harper described decedent's ill-health that afternoon. Miller described decedent's heavy work and stated that decedent was grabbing his chest and that his breathing was not normal. Savage consistently stated that decedent performed heavy work that day. Petitioner testified to decedent's problems with fatigue, stomach pain and breathing problems immediately upon arriving home from work September 10.

The Commission rejected the opinions on causal connection offered by petitioner's two medical experts and adopted "Dr. McKeever's opinion that Decedent's death could not be related to his employment" because, according to Dr. McKeever, the onset of symptoms was neither "immediate" nor "continuous."

The evidence, however, even absent Savage's testimony, demonstrated that decedent had performed heavy exertion and was sick immediately on September 10. Regarding causation, Dr. O'Berto testified for petitioner that the September 10 incident was the "most obvious" factor of stress contributing to the cause of death. Dr. O'Berto also testified that 48 hours could pass before the full extent of the infarct became apparent, depending on the degree of damage caused by the initial physical stress. Dr. Bettasso testified for petitioner that the September 10 physical stress could be a precipitating factor for acute myocardial infarction. Dr. Bettasso testified further that the cardiac disease is a process. For example, physical exertion could be a precipitating factor of acute myocardial infarction before the patient is aware of it. There could be a day between the stress

and the rhythm disturbance. An EKG might not even manifest the infarct for one to three days.

Dr. McKeever offered self-contradictory testimony regarding whether an "immediate" onset of symptoms was necessary to show a causal connection to the cardiac arrest the next day. He first testified that it could not take 18 to 24 hours for infarctions to fully demonstrate themselves. "If there are [such infarctions], I don't know about them." Dr. McKeever went on to state on cross-examination, however, that the symptomatology could be periodic. "Right. That is possible. He could have an infarction the day before, the pain goes on away and he goes about his business and then—." Dr. McKeever testified that such physical exertion followed by chest pains and fatigue which persisted to the next day "would qualify for being very suspicious of being an infarction."

The Commission also found that petitioner failed to prove her alternative contention that the recent increase in work was a contributing causative factor in decedent's death. Actually, all three physicians stated that the stressful work situation could have contributed to decedent's death. Dr. Bettasso noted decedent's "antecedent history of decreased work tolerance," which can be a "precipitating factor of pre-existing disease." Dr. O'Berto stated that decedent's recent months at work showed "this man has been under stress," and that the stress contributed to the cause of death.

Dr. McKeever initially testified that "it would be unlikely that the employment would be a direct cause of the death, being that the event occurred several hours to days since his last—since he was working." Dr. McKeever explained that he believed "25 years of working in the same business doing relatively the same job in the same environment can no longer be considered an unusual event in that particular individual, and therefore, would not be a stressful situation. It is what he does everyday." However, Dr. McKeever also testified that anxiety, frustration and emotional stress in the work environment could create an extra load on the heart.

Questions regarding contradictions in testimony are generally left to the Commission to resolve. However, notwithstanding Dr. McKeever's contradictory testimony, all three doctors stated that the long-term stress at work could contribute to the cause of death here.

■ We conclude that the Commission's finding of no causal connection, either because there was no emotional stress at work, or because there was no "immediate" or "continuous" onset of symptoms between September 10 and 11, is against the manifest weight of the evidence.

We also note the Commission's reference to decedent's preexisting conditions. Clearly, decedent suffered from heart-related and other health problems for some time before his death. The week prior to his death he evidenced numerous symptoms of ill-being which the physicians believed could be indicators of cardiac disease. However, an autopsy was not performed, and therefore, none of the doctors could determine precisely whether, *e.g.*, the prior bronchial or heart rhythm problems in any way contributed to the ultimate failure of the heart to function. Moreover, Dr. McKeever testified that the bronchial testing Dr. Ghafoor wished to perform in the hospital several days before decedent died was unrelated to heart disease. Thus, this basis of the Commission's decision is unsupported by the evidence.

■ In addition, a preexisting heart condition does not preclude an award under the Worker's Compensation Act (Ill. Rev. Stat. 1985, ch. 48, par. 138.1 *et seq.*). (*Northern Illinois Gas Co. v. Industrial Comm'n* (1986), 148 Ill. App. 3d 48, 398 N.E.2d 327.) It is only necessary to show that the stress of the employee's work was *one* causative factor and need not exclude every other possible contributing factor. (*Northern Illinois Gas Co. v. Industrial Comm'n* (1986), 148 Ill. App. 3d 48, 398 N.E.2d 327.) Thus, the Commission's finding of a preexisting condition certainly does not preclude an award.

■ We also must comment on the Commission's statement that petitioner's alternative theory was that decedent died partially as the result of silicosis. Petitioner maintains that "Silicosis is not an issue in this case ***." The record supports petitioner's view. Petitioner merely asked the treating physicians during depositions about the diagnosis of silicosis and whether it contributed in any way to the heart condition along with the job-related stress. Dr. Sanford Rabushka testified at a deposition for petitioner that the condition had been diagnosed from chest X rays, but petitioner never offered that deposition. Instead, respondent later offered the deposition despite petitioner's failure to adopt the theory.

For the foregoing reasons, the judgment of the circuit court of La Salle County, confirming the decision of the Industrial Commission, is reversed, and the cause is remanded for further proceedings consistent with the views expressed herein.

Reversed and remanded.

BARRY, P.J., and WOODWARD, McCULLOUGH and LEWIS, JJ., concur.