DELORES COGNATO, Appellant, v. THE INDUSTRIAL COMMISSION et al. (Lucca Packing Company, Appellee).

First District (Industrial Commission Division) No. 1—91—0263WC

Opinion filed January 8, 1993.

WOODWARD, J., joined by H. LEWIS, J., dissenting.

Jacobson & Sorkin, Ltd., of Chicago (Steven W. Jacobson, of counsel), for appellant.

Braun, Lynch, Smith & Strobel, Ltd., of Chicago (Francis J. Lynch, of counsel), for appellee.

PRESIDING JUSTICE McCULLOUGH delivered the opinion of the court:

Claimant, Delores Cognato, filed an application for adjustment of claim pursuant to the Workers' Compensation Act (Act) (Ill. Rev. Stat. 1983, ch. 48, par. 138.1 *et seq.*). She sought compensation for the death of her husband, Samuel Cognato (decedent), who died from a ruptured myocardial infarction, which claimant alleged occurred while Samuel worked for employer, Lucca Packing Company. After a hearing, the arbitrator awarded benefits to claimant. The Industrial Commission (Commission), with one commissioner dissenting, reversed the arbitrator's decision. Upon review, the circuit court confirmed the Commission's decision. This appeal followed.

On June 26, 1992, an opinion of this court was filed. A petition for rehearing was filed by the respondent, the petition was granted pursuant to Supreme Court Rule 367 (134 Ill. 2d R. 367) and an answer was filed by the petitioner.

On appeal, claimant raised two issues, namely, that the Commission's finding that Samuel's death did not arise out of and in the

course of his employment was against the manifest weight of the evidence; and that the Commission's finding on the causation issue is contrary to the manifest weight of the evidence.

Decedent was employed as a sausage maker by employer. On January 22, 1985, decedent tripped and fell while carrying a box of meat weighing between 50 and 75 pounds. He was transported by ambulance to Rush-Presbyterian-St. Luke's Medical Center, at which time cardio-pulmonary resuscitation was attempted. Decedent was pronounced dead upon arrival at 1:48 p.m. The death certificate states that the immediate cause of death was pericardial tamponade due to a ruptured myocardial infarction. A postmortem examination showed evidence of severe coronary arteriosclerosis and the myocardial infarction with rupture.

In the morning of January 22, 1985, Steve Magrini, another employee of the employer, stated that decedent had prepared batches of sausage from 6:15 a.m. until 10:30 a.m. Barrels of meat were brought into the sausage room where Magrini and decedent lifted the meat from the barrels with pitchforks. A barrel contains 150 pounds of different kinds of meat which are later converted into sausage. After making several batches of sausage, decedent and Magrini began grinding beef. At approximately 12:15 p.m., decedent left and went downstairs with Patrick Joslin.

Patrick Joslin worked with decedent and shared the same job responsibilities, which included making sausage, stocking shelves and loading and unloading trucks. Decedent was primarily a sausage maker, which involves running a sausage-making machine operated by a knee pedal. On January 22, 1985, a delivery consisting of 12 cases of beef tenderloin arrived at the loading dock. At approximately 12:25 p.m., Joslin and decedent began unloading the boxes, which weighed between 50 and 75 pounds. Joslin saw decedent unload five or six boxes of the meat. Shortly thereafter while carrying another case of meat, decedent tripped on a sewer and fell forward into a table. Joslin also observed that during the fall, decedent struck his head on a shelf and "just laid there." On the day of decedent's death, the temperature reached a high of 20 degrees Fahrenheit and a low of 11 degrees Fahrenheit, the average temperature measuring at 16 degrees Fahrenheit.

The employer's president, Fred Nottoli, testified that employees Steve Magrini and Pat Joslin were responsible for unloading the trucks when the meat shipments arrived. On some occasions, however, decedent would assist in the unloading. On January 22, 1985, Nottoli observed the bluish color of decedent's hand when the latter

came into the office to show Nottoli his right hand. Nottoli saw the decedent's hand around 10 a.m. and suggested that he see a doctor or go to the hospital. Decedent did not leave, however, and continued to work. Nottoli further testified that the temperature inside the plant was in the neighborhood of 50 to 60 degrees Fahrenheit.

Claimant stated that decedent was 56 years old, stood about 5 feet 10 inches and weighed 228 pounds at the time of his death. He smoked one-half a pack of cigarettes a day for an unspecified number of years. Claimant and decedent owned a two-story building in Berwyn, Illinois, which had a frozen pipe problem during the weekend preceding her husband's death.

Decedent and his son went to the building to work on the plumbing on the Monday, January 21, 1985, and possibly on Sunday, January 20, 1985. On Monday, January 21, decedent left for the building at 4 p.m. and returned home around 6:30 p.m.

Dr. Nathaniel Greenberg, board certified in internal medicine, and Dr. Michael Lesch, a board-certified cardiologist, testified before the arbitrator. Their testimony was presented with respect to the issue of whether the decedent sustained accidental injuries arising out of and in the course of his employment or that a causal relationship existed between the incident of January 22, 1985, and his death. Upon review of the medical records, Dr. Greenberg opined that the unloading and carrying of the heavy boxes of meat in the cold environment put an excessive strain on the previously infarcted heart, causing the rupture which led to the decedent's collapse and death. He further testified that the infarcted heart muscle is at its weakest between 5 to 12 days following the infarct and for this reason, individuals who have suffered from a myocardial infarction are urged to stay at rest during the critical period. He also stated that heavy work in a cold environment "is just the sort of circumstance that leads to rupture." Dr. Greenberg disputed the employer's position that the decedent's death could have been caused by repair work on frozen pipes performed the Sunday preceding his death. He further stated that exertion markedly increases the likelihood of a rupture.

Dr. Lesch testified that he saw between three to five "infarct" patients per week and had written extensively on the subject of myocardial infarction. Dr. Lesch opined that there was no relationship between the decedent's employment and the post-myocardial infarction rupture. His reasons for that opinion were basically threefold. First, Dr. Lesch reasoned that there was no causal connection because there is no data to show that effort affects the inci-

dence of post-myocardial infarction ruptures. Next, Dr. Lesch stated that the incidence of rupture does not vary according to the seasons of the year or geographical regions; hence, he concluded that temperature was not a factor. Finally, Dr. Lesch opined that effort does not affect the incidence of rupture because of recent trends in treatment of myocardial infarction patients with exercise.

He further testified that decedent's death could be explained by two alternative scenarios that would be consistent with the autopsy report. Under the first, decedent could have ruptured his heart, and then he collapsed. Under the second, decedent could have collapsed from a cardiac arrest, which necessitated the administration of cardiopulmonary resusitation, which, in turn, caused the rupture. According to Dr. Lesch, either scenario could have occurred.

Dr. Lesch also indicated that 99.9% of the cases of myocardial infarction are caused by coronary arteriosclerosis and complications thereof, which are in turn associated with such factors as high cholesterol, smoking, obesity, hypertension, diabetes, and a sedentary lifestyle. He further stated that from his research there was no data whatsoever to show that the external factors such as exertion, exercise or cold temperature played any part in causing a post-myocardial infarction rupture.

As found by the Commission, Dr. Lesch disagreed with the opinion of petitioner's expert, Dr. Greenberg, who believed the physical stress of lifting heavy boxes and the cold environment put an excessive strain on decedent's previously infarcted heart, causing the rupture and subsequent collapse and death.

The Commission adopted the findings and opinions of Dr. Lesch and found that "Decedent's collapse from a fatal heart rupture was unrelated to exertion or temperature and that in any case, Decedent's physical exertion on January 22, 1985 was minimal and not beyond his regular duties."

The arbitrator ruled in favor of the petitioner. The arbitrator's decision noted Dr. Lesch admitted that he would never allow an individual who had suffered a myocardial infarction to lift boxes weighing 50 to 100 pounds, and that strenuous activity could aggravate that condition. On review, however, the Commission relied on Dr. Lesch's testimony in reversing the arbitrator's decision. The Commission concluded that the decedent's heart rupture was unrelated to exertion or temperature and that the decedent's physical exertion on the day of his death was minimal and not beyond his regular duties.

■ It is axiomatic that the Commission's determination as to causation will not be disturbed on review unless it is against the manifest weight of the evidence. (*Horath v. Industrial Comm'n* (1983), 96 Ill. 2d 349, 356, 449 N.E.2d 1345, 1348.) Where an employee suffers a heart attack which produces disability or death, the disability or death is compensable under the Act if the heart attack is work related. (*Wheelan Funeral Home v. Industrial Comm'n* (1991), 208 Ill. App. 3d 832, 836, 567 N.E.2d 662, 665.) Compensation is not precluded by the fact that the employee may have suffered from a preexisting heart disease. (*Johns-Manville Products Corp. v. Industrial Comm'n* (1979), 78 Ill. 2d 171, 177, 399 N.E.2d 606, 609.) Where a preexisting heart disease is evident, recovery turns upon whether the heart attack was a product of the heart disease and the employment combined, or the heart disease alone. (*Tyrrell v. Municipal Employees Annuity & Benefit Fund* (1975), 32 Ill. App. 3d 91, 96, 336 N.E.2d 97, 102.) A claimant is not required to prove that the employment was the sole or principal cause, but only that the employment was a causative factor. *Wheelan Funeral Home*, 208 Ill. App. 3d at 836, 567 N.E.2d at 665.

■ If work-related stress aggravates or accelerates the heart condition so as to cause a heart attack, the heart attack is an accidental occurrence that arises out of and in the course of employment unless the employee's condition was so poor that any activity would constitute an overexertion. *Johns-Manville Products Corp.*, 78 Ill. 2d at 177, 399 N.E.2d at 610.

It is the Commission's province to judge the credibility of witnesses, to draw reasonable inferences from the testimony and to determine what weight the testimony is to be given. (*Paganelis v. Industrial Comm'n* (1989), 132 Ill. 2d 468, 483, 548 N.E.2d 1033, 1040.) Further, it is the Commission's province to resolve conflicts in medical evidence. (*Amoco Oil Co. v. Industrial Comm'n* (1991), 218 Ill. App. 3d 737, 747, 578 N.E.2d 1043, 1050.) The Commission's decision on a question of fact will not be disturbed unless it is contrary to the manifest weight of the evidence. *Paganelis*, 132 Ill. 2d at 484, 548 N.E.2d at 1040.

Where the inferences drawn by the Commission are reasonable, a court of review will not discard them merely because other inferences could be drawn from the evidence. (*Warren v. Industrial Comm'n* (1975), 61 Ill. 2d 373, 376, 335 N.E.2d 488, 490.) It is not the prerogative of the reviewing court to reweigh the evidence and substitute its judgment for that of the Commission. A reviewing court is not the trier of fact. Likewise, it is for the Commission to

decide which of two conflicting opinions should be accepted. *Material Service Corp. v. Industrial Comm'n* (1983), 97 Ill. 2d 382, 387, 454 N.E.2d 655, 657.

■■ Claimant argues that the Commission erred in relying on Dr. Lesch's opinion in determining that no causal connection existed. The employer contends that Dr. Lesch's testimony was not comprised by the concessions he made regarding the treatment of myocardial infarction in patients immediately following the disease's onset.

Dr. Lesch testified there was no causal connection because there was no data to show that effort affects the incidence of post-myocardial infarction ruptures, the incidence of ruptures does not vary according to the seasons of the year or geographical region, and that effort does not affect the incidence of rupture.

Both medical experts agreed there was no relationship between the work and the myocardial infarction because the myocardial infarction predated the work.

Dr. Lesch testified "there is no evidence anywhere in the medical literature that correlates rupture to either physical exertion or temperature." He further testified "that rupture is a natural consequence of myocardial infarction in 10 to 15 percent who die of myocardial infarction, and that this occurs because of factors which we are unaware of, and to which we can attribute no specific cause and effect relationship," and "the rupture was the natural evolutionary cause of this man's heart attack and was independent of external factors."

The subject of myocardial infarctions and ruptures is not of common knowledge and requires expert opinion with respect to causal connection in cases such as the one before us. The Commission believed Dr. Lesch, board certified in cardiology. The Commission found that the petitioner failed to prove that decedent sustained accidental injuries arising out of and in the course of his employment on January 22, 1985, or that a causal relationship existed between the incident and decedent's death. The decision of the Commission was not against the manifest weight of the evidence.

Accordingly, we affirm the judgment of the circuit court.

Affirmed.

EGAN and STOUDER, JJ., concur.

JUSTICE WOODWARD, dissenting:

I respectfully dissent. The evidence does not support the Commission's decision as to causal connection and for that reason a review of the facts and testimony of the doctors is most important.

Both Dr. Lesch and Dr. Greenberg agree that decedent suffered myocardial infarction (MI) several days prior to January 22, 1985. No one, including the decedent, was aware that decedent had an MI prior to the events that occurred shortly after noon on January 22, 1985. On that morning decedent was at work and prepared batches of sausage from 6:15 a.m. to 10:30 a.m., lifting meat out of barrels with pitchforks and grinding the beef. Around 10 a.m., decedent's right hand appeared bluish in color as witnessed by two people; however, he continued to do his regular work. At approximately 12:25 p.m., he began unloading a delivery consisting of cases of meat, each weighing between 50 to 75 pounds. While unloading the boxes of meat off the loading dock, decedent was exposed to a temperature of 20 degrees or less. Carrying a fifth or sixth case of meat, decedent tripped and fell forward into a table; decedent struck his head on a shelf, fell forward and "just laid there." He was taken to the hospital emergency room where CPR was administered; post mortem medical records stated that decedent died of a rupture of his previously infarcted heart (MI).

On the morning of January 22, 1985, Steve Magrini, another employee, confirmed that he and the decedent unloaded barrels weighing 150 pounds of different kinds of meat which were later converted into sausage. After several batches of sausage, decedent and Magrini began grinding beef. At approximately 12:15 p.m., the decedent went downstairs with Patrick Joslin, another employee. While working downstairs unloading boxes of meat with Joslin, the decedent tripped and struck his head as previously stated.

Decedent's widow, the claimant, stated that the decedent was 56 years old, stood approximately 5 feet 10 inches tall and weighed 228 pounds at the time of his death. He smoked half a pack of cigarettes a day for an unspecified number of years. Claimant and decedent owned a two-story building in Berwyn, Illinois, which had a frozen pipe problem during the weekend preceding her husband's death. Decedent and his son went to the building to work on the plumbing on Monday, January 21, 1985, and possibly on the day before which was Sunday, January 20, 1985. On Monday, January 21, decedent left for the building at approximately 4 p.m. and returned home around 6:30 p.m.

Doctors Greenberg and Lesch agree that the decedent had suffered an MI in the days preceding his death. They concurred that the rupture of the heart at the site of the MI caused his death. They each agreed that the proper care of a post-onset MI patient was hospitalization and rest. They further agreed that such treatment was to permit the MI to adequately scar over and thereby prevent a rupture. Dr. Lesch stated that the average hospital stay following an MI was between 8 and 15 days; that the patient should remain in bed for three days; on the fourth day, while still hospitalized, he will become ambulatory and his condition is monitored regularly.

Dr. Lesch stated that during hospitalization the standard treatment now includes the patient engaging in a low level of exercise, one that is well below the maximum level that a patient might otherwise achieve. No lifting is allowed and the MI patients are limited to walking. From this testimony it is clear that if the decedent had been under a physician's care immediately following the onset of the MI, he would have been hospitalized for a significant period of time and would not have been allowed to return to work until his condition had stabilized. In this case, the decedent continued to work in a physically demanding job following his MI, which both doctors agree had occurred a few days prior to the date of his death.

Dr. Lesch admitted that he would not permit a post-MI patient to lift 50 to 100 pounds of boxes as decedent did immediately prior to his death. Dr. Lesch acknowledged that it would be inappropriate to send an MI patient back to work to perform lifting tasks within a two-week period following an MI.

Dr. Lesch's admissions concerning the proper treatment of an MI patient seriously undercut his opinion that no causal connection existed between decedent's work activities and his death due to a ruptured MI. Dr. Lesch appears to want it both ways. On the one hand, he subscribes to a treatment modality which hospitalizes MI patients and permits them only minimal physical activity. On the other hand, he finds that decedent's lifting of 50- to 100-pound boxes of meat and tripping and falling forward, following a morning of substantial lifting, played no part in the MI's rupture. Either exertion is a causative factor in the rupture of a myocardial infarction or it is not. Dr. Lesch's statement as to his treatment of MI patients clearly admits that exertion is a critical factor relating to the rupture of a MI.

Another example of Dr. Lesch's equivocation came in his response to the question, "Could lifting 50- to 100-boxes aggravate a preexisting myocardial infarction?" Dr. Lesch answered that it may or may not, that he could prove neither and that he could not disagree with

the statement that it may. It is well established that a finding of a causal relationship may be based on a medical expert's opinion that an accident "could have" or "might have" caused an injury. *Mason & Dixon Lines, Inc. v. Industrial Comm'n* (1983), 99 Ill. 2d 174.

Further vitiating Dr. Lesch's opinion as to causation is his admission that if CPR can cause an MI rupture, then certainly a blow to the chest such as falling forward while carrying a heavy box can cause a rupture.

Dr. Lesch's admissions concerning the proper treatment of a myocardial infarction patient seriously impair the weight of his opinion that no causal connection existed between decedent's work activities on January 28, 1985, and his death due to a ruptured myocardial infarction.

Moreover, as Commissioner Tansor pointed out in his dissent, decedent was under greater physical stress than normal on the day in question. Witness Notoli *acknowledged* that unloading delivery trucks was not one of decedent's regular duties.

In direct contrast to Dr. Lesch's wavering testimony is that of Dr. Nathaniel Greenberg, board certified in internal medicine. Dr. Greenberg's review of the relevant records revealed the following. The postmortem examination revealed a myocardial infarction that had existed for a week to 10 days, with a rupture of the heart at the site of the infarction. The postmortem examination also indicated that approximately a pint of blood escaped through the rupture into the pericardial sac, which caused the decedent's death. Dr. Greenberg opined that the unloading and carrying of the heavy boxes of meat in the cold environment put an excessive strain on the previously infarcted heart causing the rupture which lead to decedent's collapse and death. Dr. Greenberg explained that infarcted heart muscle is at its weakest between 5 to 12 days following the infarct. For this reason, individuals who have suffered from myocardial infarctions are urged to stay at rest during that critical period. Dr. Greenberg testified further that heavy work and cold environment "[are] just the sort of circumstance that leads to rupture."

During cross-examination, Dr. Greenberg described a rupture as a very abrupt event. If the rupture is not repaired in a matter of minutes, the rupture will be fatal. Dr. Greenberg further explained that a rupture was not a result of a pinhole or slight aperture that expands over time due to blood pressure. Such expansion, if any, would occur over a period of seconds or minutes, not hours or days. Moreover, only a half dozen heartbeats were required to fill up the pericardium with blood if an individual sustained a one-half-inch rupture. Dr.

Greenberg disputed the employer's position that the decedent's death could have been caused by repair work on frozen pipes performed the Sunday preceding his death. Dr. Greenberg explained that the decedent's repair work on the Sunday preceding his death was not the cause of his death because the decedent's heart did not rupture at that time. As to what actually happened to decedent, Dr. Greenberg believed that the rupture occurred while he was carrying a box of meat. Decedent then collapsed and died within seconds.

When asked if a rupture could occur absent effort, Dr. Greenberg replied that such occurrences have been known to happen, but the frequency is very low. Dr. Greenberg testified further that standard works on cardiology would illuminate the relationship between physical activity and post-myocardial infarction ruptures. Citing works by White, Friedberg and Hurt, Dr. Greenberg explained that exertion markedly increases the likelihood of rupture.

The principles established in heart attack cases are applicable here. Where an employee suffers a heart attack which produces disability or death, the disability or death is compensable under the Act if the heart attack is work related. *Wheelan Funeral Home v. Wiggins* (1991), 208 Ill. App. 3d 832.

A preexisting heart condition does not preclude an award under the Workers' Compensation Act (Ill. Rev. Stat. 1985 48, par. 138.1 *et seq*). (*Ludwig v. Industrial Comm'n* (1989), 192 Ill. App. 3d 729.) For a heart attack to be compensable, an employee must prove that some act of employment was a causative factor, but *it need not be the sole or even a principal causative factor. Northern Illinois Gas v. Industrial Comm'n* (1986), 148 Ill. App. 3d 48.

Based on Dr. Greenberg's testimony that the decedent's physical exertion in a cold environment caused the rupture of his MI and the admissions elicited from Dr. Lesch as to the proper treatment of myocardial infarction patients, we find that decedent's work-related activity was a causative factor in decedent's death and that the Commission's decision is against the manifest weight of the evidence.

Accordingly, we would reverse the judgment of the circuit court.

LEWIS, J., joins in this dissent.