THE CHICAGO PARK DISTRICT, Appellant, v. THE INDUSTRIAL COMMISSION *et al.*, (Eugene Dechter, Appellee).

First District (Industrial Commission Division)   No. 1—93—2076WC

Opinion filed May 13, 1994.

RARICK, J., joined by EGAN, J., dissenting.

Sweeney & Riman, Ltd., of Chicago (Gerald O. Sweeney, of counsel), for appellant.

Phillip Johnson, of Chicago, for appellee.

JUSTICE SLATER delivered the opinion of the court:

Claimant Eugene Dechter filed an application for adjustment of claim pursuant to the Workers' Compensation Act (the Act) (Ill. Rev. Stat. 1985, ch. 48, par. 138.1 *et seq.*) alleging that he was injured as a result of an altercation. The arbitrator found that claimant was permanently and totally disabled as a result of an accident which arose out of and in the course of his employment. On review, the Industrial Commission (the Commission) affirmed the arbitrator's decision. The circuit court confirmed the Commission and the employer, Chicago Park District, appeals.

Claimant began working for the employer in 1961 as an assistant general attorney. His duties included preparing ordinances and contracts and dealing with bond issues and condemnations. He was eventually promoted to second assistant general attorney. In 1982 claimant began working under Rick Halprin, who was then employer's general counsel. Prior to that time, claimant had never received a reprimand or criticism of his work. Halprin found claimant's work unsatisfactory, however, and his written evaluations of claimant were well below average. According to claimant, Halprin would occasionally refer to other attorneys in the office in a derogatory manner and at one time he indicated that he expected claimant to testify that a particular attorney was incompetent. Claimant indicated that he would not do so and Halprin became angry. Thereafter, Halprin changed his work assignments and gave him duties that were usually performed by law clerks or paralegals.

On September 19, 1985, Halprin came into claimant's office to discuss a children's museum permit agreement. According to claimant, Halprin threw the agreement on his desk, cursed at him, and told him to redo the agreement and not to put in any provision regarding handicapped access. Forty-five minutes later, claimant found a memorandum from the Federal government indicating that the handicapped provision was necessary. He walked into Halprin's office and told him it would be necessary to put in the provision for the handicapped. Halprin began screaming and using profanity toward him and claimant then screamed back at him, saying, "You're not a lawyer. You think you're a lawyer." Halprin told claimant to "get the hell out" and then he punched claimant in the chest. According to claimant, Halprin kept slapping him and hitting him as he tried to leave the room. Halprin pursued him as he left the office and kept hitting him around the body, and claimant then felt like he blacked out. Bob Donovan, the first assistant general attorney, grabbed Halprin away from claimant and directed him back to his office.

Paramedics were called and claimant went home after a couple

of hours. He saw his physician the next day and returned to work on the following Monday, September 23. After he returned he had difficulty concentrating and he would get physically sick when he saw Halprin. He eventually went to a psychiatrist, Dr. Bloch, in November of 1985. Claimant continued working while receiving psychiatric care from Dr. Bloch. Claimant tried to limit his contact with Halprin whenever possible. In February of 1986, Halprin left and Michael Hennessey became general counsel. Claimant still experienced psychological difficulties after Halprin left, but he was "able to do a little more" and felt he was "getting back on [his] feet." Halprin would come into the office periodically and claimant became agitated whenever this occurred or when he thought it might occur.

In June of 1986, claimant and Bob Donovan were having lunch when Donovan mentioned that Halprin was in the office and it was rumored that he would be returning as general counsel. Claimant became extremely upset, left the restaurant and went to employer's medical department. Claimant informed the company doctors he was ill and he did not return to work after that date. Employer's personnel records show claimant was on sick leave as of July 1, 1986.

On October 20, 1986, George Gallard, employer's acting general counsel, advised claimant that his position had been written out of the 1987 budget and that his employment would be terminated as of January 1, 1987. Claimant filed a workers' compensation claim after he received this notification. Claimant received his last psychiatric treatment from Dr. Bloch on December 9, 1986. He did not obtain any further care from Dr. Bloch because of financial difficulties.

On cross-examination, claimant testified that at the time of the incident he was 5 feet 9 inches tall and he weighed approximately 225 pounds. Halprin weighed considerably less, perhaps 160 pounds. Claimant stated that he did not attempt to hit Halprin. He acknowledged that someone had written a "D-minus" on a letter that he had prepared and he was irritated by it. This was the document that Halprin had thrown on his desk. Claimant identified joint exhibits 1 through 26 as representing his signature on work which he had performed subsequent to September 19, 1985, and he verified his signature on the documents, including correspondence and other legal forms and exhibits. When asked to describe his activities on a typical day, claimant stated that he would "[e]at, watch television and sulk." He would also do errands such as going to the grocery store and bank and he could perform household chores and repairs. Although claimant testified that he was unable to work, he admitted that he had not looked for work.

Rick Halprin testified that he was general counsel for the Chicago

Park District between July of 1982 and February of 1986. He regarded claimant's work as unsatisfactory. On September 19, 1985, claimant appeared at his door shouting in a loud voice something like, "D-minus, D-minus, that is what you think of my work?" Halprin asked him to calm down and finally asked him to leave his office, but he refused to leave and, instead, came farther into the office and moved toward him with his hands up even with his shoulders. Halprin grabbed claimant by the shirt and slapped him twice and claimant ran from the office screaming that Halprin had struck him. According to Halprin, it was Jack Matthews, the treasurer of the Park District, who had written "D-minus, not acceptable" on claimant's document. Halprin stated that at the time of the altercation he was wearing a full body cast as a result of a spinal fusion. He did not intend to hit claimant but he was trying to protect himself and he felt that claimant was going to shove him. He denied that the altercation was related to inserting a handicapped access provision into the museum permit. He also denied that he changed claimant's assignments after the altercation. Halprin noticed nothing unusual about claimant after the incident. Claimant's duties and performance did not change before or after September 19, 1985, and he did not at any time urge claimant to testify regarding the alleged incompetence of a lawyer in the department.

Priscilla Hallberg, the office nurse, examined the claimant shortly after the incident. She did not observe any bruises or redness, but claimant complained of tingling in his hand and soreness in his shoulder. Claimant's blood pressure was slightly elevated, but an EKG was normal. Claimant told Hallberg that he had been attacked by Halprin, who struck him, pushed him and attempted to strangle him.

Bob Donovan testified that on the day of the incident he heard loud talking coming from Halprin's office. When claimant and Halprin came out of the office, claimant had his arms by his side and Halprin had his fists clenched and was circling around claimant. Donovan did not see Halprin hit claimant. Donovan grabbed Halprin and walked him into his office.

Judith Somogyi, Rick Halprin's secretary, testified that her desk was located within six feet of Halprin's office. On September 19, 1985, claimant walked rapidly past her and into Halprin's office. Claimant looked upset and he was red in the face. Somogyi heard yelling back and forth and she then heard claimant say, "You hit me." Claimant backed out of Halprin's office, clutching his neck. Somogyi did not see Halprin strike claimant.

Carolyn Bates, a stenographer, was taking dictation from Bob Donovan on the date of the incident. Claimant entered Halprin's of-

fice and Bates heard yelling followed by claimant's statement, "You hit me." Claimant came out of Halprin's office holding his throat, and Halprin also came out. Bates did not see any blows exchanged.

The medical reports of Dr. Arthur H. Bloch, a psychiatrist who first examined claimant on November 12, 1985, were admitted into evidence. According to Bloch's April 30, 1986, report, immediately following the incident claimant experienced acute anxiety symptoms such as tachycardia (rapid heart rate), dizziness, hyperventilation and palpitations. Claimant contacted Dr. Bloch because these symptoms persisted and he was unable to work. Claimant experienced chills, feverishness, shaking, headaches and stomachaches when he thought about going to work. Other symptoms included insomnia, an inability to concentrate, impaired memory, nightmares and avoidance of activities that might arouse recollection of the incident. Dr. Bloch diagnosed claimant as suffering from post-traumatic stress disorder, and he noted that claimant was "technically in the chronic phase of treatment." Bloch felt that the success of claimant's treatment during the acute phase was demonstrated by his ability to remain employed during that period. Bloch concluded that treatment was still required "to deal with the psychological sequelae of the acute episode."

In a second report dated February 3, 1987, Dr. Bloch noted that the medication he had prescribed for claimant had helped "only to a limited degree" and psychotherapy was "minimally successful." Overall, claimant had made some strides in treatment, although Bloch felt that he "may never be able to function successfully in the environment in which the original trauma occurred."

Claimant saw Dr. Henry Conroe for a psychiatric evaluation at employer's request on July 29, 1988. At that time claimant was 53 years old. Dr. Conroe noted that claimant had recurrent dreams about the September 19 incident and he feared seeing Halprin on the street. Claimant experienced a loss of interest in activities he previously enjoyed, a loss of libido, periodic insomnia, suicidal ideation and decreased self-esteem. Dr. Conroe diagnosed claimant as suffering from post-traumatic stress disorder and dysthymic disorder, a mood disorder characterized by depression and loss of interest in one's usual activities. In Conroe's opinion, claimant's relationship with Halprin, culminating in the September 19 incident, led to the development of these disorders. Conroe concluded that claimant "continues to be unable to sustain gainful work activities."

Dr. Bloch reexamined claimant on August 15, 1989. Claimant exhibited symptoms of depression, including a depressed affect, psychomotor retardation, isolation, reduced energy levels, weight gain

and impaired memory and concentration. Symptoms of post-traumatic stress disorder included recurrent nightmares, lack of motivation, poor concentration and an irrational fear that if claimant went downtown Halprin would kill him. Claimant felt that he would have committed suicide if he had been forced to stay on the job. In Bloch's opinion, claimant needed treatment, and his condition "seriously impaired his daily, let alone professional functioning, and has resulted in a significant depression."

Two detectives hired by employer testified regarding their surveillance of claimant on October 31 and November 1, 5 and 6 of 1990. Claimant met with a man and woman and went with them to a title insurance office, where they remained for approximately two hours. Claimant was also observed driving his wife to a clinic, depositing some trash bags into a dumpster, going to the cleaners, a convenience store, a savings and loan and a jeweler.

Claimant testified that he participated in a real estate closing on October 31, 1990, as a favor to a former associate, Mr. Ash, who was ill. He took Valium and other medications before the closing and he did not feel capable of performing other closings. According to Dr. Conroe's report, however, claimant told him that he was at three real estate closings in 1987 and one in 1988.

As indicated earlier, the arbitrator found that claimant was totally and permanently disabled as a result of an accident which arose out of and in the course of his employment. The Commission affirmed the arbitrator's decision and the circuit court confirmed the Commission. On appeal, employer contends that claimant failed to prove that he sustained accidental injuries which arose out of and in the course of his employment. Specifically, employer maintains that claimant was the aggressor, and that the events of September 19, 1985, were not an accidental injury as defined by Illinois law.

■ Injuries arising from an assault by a co-worker at the work place during work hours are compensable if the assault arose in the course of a dispute involving the conduct of the work. (*Rodriguez v. Industrial Comm'n* (1982), 95 Ill. 2d 166, 447 N.E.2d 186; *Village of Winnetka v. Industrial Comm'n* (1993), 250 Ill. App. 3d 240, 621 N.E.2d 150.) Where the party seeking compensation was the aggressor, however, his acts are not within the scope of employment and are not compensable. *Ford Motor Co. v. Industrial Comm'n* (1980), 78 Ill. 2d 260, 399 N.E.2d 1280.

Employer asserts that the only reasonable inferences raised by the evidence are that claimant harbored anger and resentment against Halprin, that his anger was increased by the D-minus "grade" on his work, that he went to Halprin's office in a fit of rage and that

Halprin merely took reasonable and necessary steps to protect himself and to calm claimant when he approached in a threatening manner. Employer notes that the fact that one party made the first physical contact is not decisive in determining who was the aggressor; such a determination depends upon the totality of the circumstances. See *Ford Motor Co.*, 78 Ill. 2d 260, 399 N.E.2d 1280.

■ While we agree that the inferences drawn by employer are not completely unreasonable, a reviewing court cannot disregard permissible inferences drawn by the Commission merely because different inferences may be drawn from the same set of facts. (*Martin v. Industrial Comm'n* (1992), 227 Ill. App. 3d 217, 591 N.E.2d 108.) Even under Halprin's version of the incident, the Commission could have concluded that Halprin overreacted and acted inappropriately. Moreover, in rejecting employer's argument that claimant was the aggressor, the Commission specifically found that claimant's testimony concerning the incident was credible. It is the province of the Commission to resolve any conflicts in the testimony and to choose between conflicting inferences. (*Dexheimer v. Industrial Comm'n* (1990), 202 Ill. App. 3d 437, 559 N.E.2d 1034.) We find that the Commission's determination that claimant was not the aggressor was supported by the evidence.

■ The employer also makes a somewhat disjointed argument in which it appears to contend that the physical trauma suffered by claimant was insufficient to cause his psychological condition. Employer relies on *Chicago Board of Education v. Industrial Comm'n* (1988), 169 Ill. App. 3d 459, 523 N.E.2d 912, in which the court held that, to be compensable under the Occupational Diseases Act (Ill. Rev. Stat. 1985, ch. 48, par. 172.36 *et seq.*), mental disorders *not resulting from trauma* must arise from something other than the daily emotional strain and tension that all employees experience. *Chicago Board of Education* is clearly inapposite to this case, in which claimant's psychological problems were traceable to a particular incident involving both physical and emotional trauma. In *Pathfinder Co. v. Industrial Comm'n* (1976), 62 Ill. 2d 556, 343 N.E.2d 913, the court held that an employee who suffers a sudden, severe emotional shock traceable to a definite time, place and cause which causes psychological injury has suffered an accident within the meaning of the Act, even where no physical trauma or injury was sustained. The court noted that it had previously allowed claimants to recover for psychological disability or injury where there was minor physical contact and injury. (*Pathfinder*, 62 Ill. 2d at 564; see also *Olin Industries, Inc. v. Industrial Comm'n* (1946), 394 Ill. 202, 68 N.E.2d 259; *Marshall Field & Co. v. Industrial Comm'n* (1922), 305

Ill. 134, 137 N.E. 121.) The question of whether there is a causal connection between a claimant's injury and his employment is uniquely within the province of the Commission (*Organic Waste Systems v. Industrial Comm'n* (1993), 241 Ill. App. 3d 257, 608 N.E.2d 1243), and its decision will not be disturbed on review unless it is against the manifest weight of the evidence (*Cognato v. Industrial Comm'n* (1993), 242 Ill. App. 3d 50, 609 N.E.2d 783). A finding is not against the manifest weight of the evidence unless an opposite conclusion is clearly evident. (*Hicks v. Industrial Comm'n* (1993), 251 Ill. App. 3d 320, 621 N.E.2d 293.) In this case the evidence clearly supported the Commission's finding that claimant's psychological problems were causally related to the September 19 incident.

■ Employer's final contention is that the Commission's finding that claimant was permanently and totally disabled is against the manifest weight of the evidence. Employer notes that after the September 19, 1985, incident, claimant continued to work until June of 1986. Employer also points out that claimant was able to participate in real estate closings in 1987, 1988 and 1990. Employer also argues that the psychiatrists' reports were based entirely on claimant's subjective complaints and contained no scientifically verifiable objective findings. Employer further maintains that the psychiatrists did not specifically find that claimant was totally and permanently disabled.

A person is totally disabled when he cannot perform services except those that are so limited in quantity, quality or dependability that there is no reasonably stable market for them. (*A.M.T.C. of Illinois, Inc. v. Industrial Comm'n* (1979), 77 Ill. 2d 482, 397 N.E.2d 804.) Where, however, an employee is qualified for and capable of obtaining employment without seriously endangering his health or life, he is not totally and permanently disabled. (*E.R. Moore Co. v. Industrial Comm'n* (1978), 71 Ill. 2d 353, 376 N.E.2d 206.) "In arriving at a determination of an award for permanent and total disability, the Commission should consider the extent of the claimant's injury, the nature of his employment, his age, experience, training and capabilities." *A.M.T.C.*, 77 Ill. 2d at 489, 397 N.E.2d at 807.

A claimant has the burden of proving the extent and permanency of his injury by a preponderance of the evidence; liability cannot be premised upon imagination, speculation or conjecture. (*A.M.T.C.*, 77 Ill. 2d 482, 397 N.E.2d 804.) The extent and permanency of a claimant's disability are questions of fact, and the Commission's factual determinations will not be overturned unless they are against the manifest weight of the evidence. *Amoco Oil Co. v. Industrial Comm'n* (1991), 218 Ill. App. 3d 737, 578 N.E.2d 1043.

In this case, we find that claimant failed to meet his burden of proof. Although Dr. Conroe concluded that claimant "continues to be unable to sustain gainful work activities," neither he nor Dr. Bloch indicated that claimant's condition was permanent. Indeed, Dr. Bloch's February 3, 1987, report stated that claimant had "made some strides" in treatment, although he "may never be able to function successfully *in the environment in which the original trauma occurred.*" (Emphasis added.) This suggests that claimant would be able to function in some other, less threatening, setting. In addition, a person with claimant's experience and education would appear qualified for a wide variety of jobs, both legal and nonlegal. We hold, therefore, that the Commission's finding of total and permanent disability was against the manifest weight of the evidence, and we remand for a determination of the extent of claimant's disability.

For the reasons stated above, the judgment of the circuit court is affirmed in part and reversed in part. This cause is remanded to the Commission for further proceedings consistent with this order.

Affirmed in part; reversed in part and remanded.

McCULLOUGH, P.J., and WOODWARD J., concur.

JUSTICE RARICK, dissenting:
Although the majority correctly notes that the extent and permanency of a claimant's disability are questions of fact and that the Commission's factual determinations will not be overturned unless they are against the manifest weight of the evidence (*Amoco Oil Co. v. Industrial Comm'n* (1991), 218 Ill. App. 3d 737, 748, 578 N.E.2d 1043, 1051), the majority proceeds to find the Commission's determinations as to total and permanent disability to be against the manifest weight of the evidence in this instance. Manifest weight of the evidence is that which is clearly evident, plain and indisputable. (*Caterpillar, Inc. v. Industrial Comm'n* (1992), 228 Ill. App. 3d 288, 291, 591 N.E.2d 894, 896.) In order for a finding to be contrary to the manifest weight of the evidence, an opposite conclusion must be clearly apparent. (228 Ill. App. 3d at 291, 591 N.E.2d at 896.) Stated differently, a decision is contrary to the manifest weight of the evidence only when, after viewing the evidence in a light most favorable to the Commission, the court determines that no rational trier of fact could have agreed with the Commission's decision. (See *Beeler v. Industrial Comm'n* (1989), 179 Ill. App. 3d 463, 467, 534 N.E.2d 408, 411.) Not only do I believe the opposite conclusion is not clearly apparent, I believe the evidence here clearly compels affirmance of the Commission's decision. For these reasons, I dissent.

The evidence reveals claimant's treating physician, Dr. Bloch, considered claimant's condition to be chronic. While claimant had made some strides, according to Dr. Bloch, claimant also may never be able to function successfully in the work environment again. Claimant has become extremely depressed to the point of having suicidal ideations, and his inability to participate in even joyful activities, such as his oldest son's wedding, has served only to heighten his sense of isolation and decrease his already critically low self-esteem. He has little energy or motivation, and his concentration is quite poor. Not only has claimant's condition impaired his professional functioning, it has also impaired his daily living. Even employer's expert, Dr. Conroe, opined claimant was unable to sustain gainful work activities. Prior to the September 1985 incident, claimant had worked effectively for employer for some 20 years, had a successful marriage and social life, and had no history of mental disorders. Now claimant can do little else other than sit in front of the television and accomplish minor chores or errands. It was all he could do to attend three real estate closings during a two-year period. Moreover, the fact claimant can accomplish some things of a limited nature does not mean claimant is not totally disabled. (See *E.R. Moore Co. v. Industrial Comm'n* (1978), 71 Ill. 2d 353, 361, 376 N.E.2d 206, 209.) Being unable to perform substantially the duties of his occupation, claimant is, in my view and in that of the Commission, totally and permanently disabled. The majority's statement that claimant would appear qualified for a wide variety of jobs, both legal and nonlegal, is not supported by the record, and in my view, is pure speculation. As liability cannot be premised upon imagination, speculation or conjecture (see *A.M.T.C. of Illinois, Inc. v. Industrial Comm'n* (1979), 77 Ill. 2d 482, 488, 397 N.E.2d 804, 806), neither can a finding of no liability or, in this instance, a finding of no permanent, total disability. Given the unrebutted medical evidence supporting the finding of the Commission, I believe the majority has impermissibly substituted its judgment for that of the Commission. I would therefore affirm the decision of the Commission, as confirmed by the circuit court, in its entirety.

EGAN, J., joins in this dissent.