IRWIN ROTBERG, Appellant, v. THE INDUSTRIAL COMMISSION *et al.* (Chicago Public Schools, a/k/a Chicago Board of Education, Appellee).

First District (Illinois Workers' Compensation Commission Division)
No. 1—04—3013WC

Opinion filed October 5, 2005.—Rehearing denied November 10, 2005.

McCULLOUGH, P.J., dissenting.

Wittenberg, Dougherty & Maglione, of Chicago (David M. Wittenberg, of counsel), for appellant.

Patrick J. Rocks, Jr., of City of Chicago Law Department, and Michael J. Cohen, of Law Department of Chicago Board of Education, both of Chicago, for appellee.

JUSTICE HOFFMAN delivered the opinion of the court:

The claimant, Irwin Rotberg, appeals from an order of the circuit

court confirming a decision of the Industrial Commission (Commission)[1] denying him benefits under the Workers' Compensation Act (Act) (820 ILCS 305/1 *et seq.* (West 1998)), for injuries he allegedly sustained on May 24, 1999, while in the employ of the Chicago Board of Education (Board). For the reasons that follow, we reverse and remand the matter to the Commission with directions.

The following relevant facts were established by the evidence presented at the arbitration hearing.

In May 1999, the claimant was employed by the Chicago Board of Education as a third-grade teacher at Gillespie Elementary School (Gillespie School). On May 21, 1999, between 10:30 and 10:45 a.m., a fight broke out between two of the claimant's students as he was taking the class for a toilet recess. According to the claimant's testimony, he tried to intervene in the fight. He stated that he placed his hands on the wrist of Jason Sears, the aggressor, and led the child to the end of the line.

On May 24, 1999, between 9:30 and 9:45 a.m., the claimant was summoned to the school's main office. Present in the office were Spencer Adams, the principal, Beverly Slater, Doris Jordan and Pamela Sears, Jason's mother. Mrs. Sears accused the claimant of beating her son. According to the claimant, Adams told Mrs. Sears that, if the claimant beat her son, he should be charged with battery. When the meeting concluded, the claimant returned to his classroom duties.

Between 2:30 and 2:40 p.m. on that same day, the claimant was again summoned to the main office. When he arrived at the office, the claimant was met by six Chicago police officers. The officers placed the claimant under arrest for battery and immediately handcuffed him. According to the claimant, he asked the officers to loosen the handcuffs as they were hurting his hands. The officers refused. The claimant was placed in the rear seat of a squad car and transported to the police station.

The claimant testified that, when he arrived at the police station, he was handcuffed to a pole for 25 to 30 minutes before being strip-searched, fingerprinted, and placed in a cell. According to the claimant, when the handcuffs were removed, his hands were bloody, scraped, and bruised. He testified that he was refused water and, when he asked to use the restroom, he was told to urinate on the floor.

Prior to the events on May 24, 1999, the claimant was treated for

---

[1]Effective January 1, 2005, the name of the Industrial Commission was changed to the "Illinois Workers' Compensation Commission." However, because the Industrial Commission was named as such when the instant cause was originally filed, we will use this name for purposes of consistency.

psychiatric problems. In 1992, the claimant was referred to Dr. Patrick E. Ebenhoe, a psychiatrist, who treated him for anxiety, panic attacks, and compulsive behavior involving eating and showers. In 1995, Dr. Ebenhoe referred the claimant to Dr. Gerald Blechman, a clinical psychologist, who has since continuously treated him.

The claimant testified that, when he was arrested, he became very panicky and anxious, started to sweat profusely, experienced heart palpitations, and could not stop shaking and trembling. The claimant stated that, while he was at the police station, he felt pain and anxiety and could not stop sweating even though the air conditioning was on. According to the claimant's wife, a registered nurse, when she spoke to the claimant by phone while he was in police custody, he was babbling and incoherent. George Simmons, a friend of the claimant, was present at the police station when the claimant was released. Simmons testified that, when he saw the claimant, he was disheveled, extremely disoriented, agitated, and very upset. Simmons drove the claimant back to his car in the school's parking lot. Simmons stated that, after the claimant got into his car, he led the claimant to the expressway because the claimant was disoriented. The claimant testified that, as he drove home, his legs were twitching, he was anxious and distraught, he was sweating and shaking, and his wrists were sore. When he arrived home, the claimant called Dr. Blechman.

When the claimant returned to work on May 25, 1999, he was told that he could not teach children until the charges against him were resolved, and he was assigned to a clerical position in the school office.

The claimant applied for a disability pension from the Public School Teachers Pension Fund (Fund). In support of the application, on September 13, 1999, Dr. Jeffrey Weinberg, the claimant's internist who referred him to Dr. Ebenhoe in 1992, issued a report to the Fund stating that the claimant suffers from depression and panic/anxiety disorder, that he has been under psychiatric care since 1989, and that his condition worsened since his arrest. The report states that the claimant was taking a combination of Prozac, Xanax, and Trazadone. Dr. Weinberg reported that the claimant suffers from severe anxiety when in a classroom and is unable to function in that environment. Dr. Weinberg opined that the claimant suffers from a disability that wholly and "presumably" permanently incapacitates him for teaching.

The claimant continued to perform clerical duties until September 27, 1999, when the charges against him were dismissed. At that time, the acting principal requested that he return to a teaching position. The claimant testified that he requested to be assigned to a nonteaching position, but his request was denied. Thereafter, the claimant worked as a gym teacher for four days and acted as a substitute fifth-grade teacher.

On October 16, 1999, Dr. Blechman also issued a report in support of the claimant's application for a disability pension. In that report, he diagnosed the claimant as suffering from panic disorder without agoraphobia. Dr. Blechman revealed that the claimant had been under his care since April of 1995, but that he had suffered from the condition for several years before beginning treatment. According to the report, the accusation that the claimant physically abused a student followed by his incarceration exacerbated the panic-anxiety related to his teaching duties. Dr. Blechman also opined that the claimant suffers from a disability that wholly and "presumably" permanently incapacitates him for teaching.

On November 2, 1999, the claimant requested a medical leave of absence and, on the following day, he began receiving sick pay. In support of the claimant's request for a medical leave of absence, Dr. Weinberg issued a report to the Board on November 18, 1999, again listing a diagnosis of depression and panic/anxiety disorder and stating that the claimant's condition is permanent. Dr. Blechman issued a report on November 19, 1999, repeating his diagnosis of panic disorder without agoraphobia and stating that the claimant was unable to function at work.

Relating to the claimant's application for a disability pension, the Fund had him examined by two psychiatrists; Dr. Richard S. Abrams on November 12, 1999, and Dr. John Utley on November 16, 1999. Both physicians found the claimant to be suffering from a permanent disability that incapacitates him for teaching. Dr. Abrams diagnosed the claimant as suffering from panic disorder and obsessive-compulsive neurosis, both mild to moderate and "probably influenced by medication." Dr. Utley diagnosed obsessive-compulsive disorder, panic disorder without agoraphobia, and social phobia. He noted that the claimant had functioned successfully in spite of his condition "until the occurance [sic] of an unfounded criminal accusation," since which time "his symptoms have expanded to include criteria for social phobia marked by fear of scrutinyi [sic] incrimination from the exposure of classroom work."

When the claimant's leave of absence and sick pay expired on January 4, 2000, he resigned his position with the Board. Thereafter, the Fund found the claimant to be permanently disabled and awarded him a disability pension.

During the course of this litigation, the claimant was examined by a number of other psychiatrists and psychologists who issued reports addressed to the claimant's mental condition, his ability to work as a teacher, and the causal relationship, if any, between the claimant's arrest and incarceration and his current condition of ill-being.

Dr. William A. Hovsepian, Ph.D., interpreted an MMPI-2 test administered to the claimant on April 29, 2000. According to Dr. Hovsepian's report dated May 1, 2000, the test results suggest that the claimant suffers from high levels of depression with vegetative symptomatology; self-deprecating ideation; labile affect; high aggressive potential, both verbal and physical; and cognitive decompensation with possible psychotic-like tendencies.

In a report dated May 10, 2000, based on an examination of the claimant that took place on April 28, 2000, Dr. Timothy M. Cullinane, M.D., diagnosed the claimant as suffering from, *inter alia*, major depression, post-traumatic stress disorder, obsessive-compulsive disorder, panic disorder with agoraphobia, probable narcissistic personality disorder, trauma from being jailed, and long-standing and multiple psychiatric problems. Dr. Cullinane stated in his report a belief that the claimant's post-traumatic stress disorder caused by his being put in jail has made him unable to function as a teacher and opined that, had it not been for the claimant being put in jail, he would still be working. Dr. Cullinane was also highly critical of the claimant's current treatment, calling it "sub-optimal."

Dr. Ronald J. Ganellen, Ph.D., evaluated the claimant on August 21, 2000. Dr. Ganellen interviewed the claimant, reviewed his medical records and the reports from the claimant's treating physicians and psychologists, and administered a number of tests, including the MMPI-2. According to Dr. Ganellen's report of that evaluation, the results of the MMPI-2 were consistent with "chronic emotional difficulties and longstanding characterological problems." He stated that the claimant's emotional difficulties began during his childhood and persisted continuously until the present and include chronic symptoms of anxiety and depression; marked characterological difficulties and problems of interpersonal relationships; frequent, recurrent panic attacks consistent with panic disorder with agoraphobia; obsessive-compulsive disorder; eating disorder; and depression. Dr. Ganellen was of the opinion that, although the claimant's increased worry, tension and anxiety after the May 24, 1999, incident "appear to be an exacerbation of his condition," the symptoms of emotional distress that the claimant reported after his arrest and incarceration "should be considered a continuation of his lifelong, persistent anxiety and depression, rather than the onset of a new condition."

At the request of the Board, Dr. Jonathan Kelly, M.D., examined the claimant on July 6, 2000, and reviewed his medical records and the reports of prior examining psychiatrists and psychologists, including Dr. Ganellen. In a report dated December 20, 2000, Dr. Kelly diagnosed the claimant as suffering from mood disorder with depres-

sion and hypomanic features; dysthymic disorder; panic disorder with agoraphobia, obsessive-compulsive disorder; eating disorder; and personality disorder with borderline narcissistic and antisocial features. However, Dr. Kelly opined that the claimant does not have a mental disorder that is causally related to the events of May 1999. According to Dr. Kelly, the claimant is genetically predisposed to psychiatric illness, and the disorders from which he suffers were present prior to May 1999. Dr. Kelly was also of the opinion that the claimant does not have a post-traumatic stress disorder, and the claimant's treatment records from May 1999 through November 2000 do not establish a pervasive, persistent deterioration in functioning or a substantial increase in symptoms. He noted further that the claimant's medical records reference his being a pathological liar and that secondary gain and external incentives are present as motivating factors for symptom exaggeration or fabrication.

Dr. Frank Leavitt, Ph.D., examined the claimant on March 16, 2001, and March 29, 2001, and administered a variety of tests, including the MMPI-2. In a report dated April 4, 2001, Dr. Leavitt stated that the claimant has identifying characteristics of a panic disorder without agoraphobia and meets the diagnostic criteria for generalized anxiety, recurrent major depression, and obsessive-compulsive disorder. According to Dr. Leavitt, there is no indication that the claimant is exaggerating his current emotional problems. He opined that the claimant is permanently disabled from teaching and that his disability is causally related to "the traumatic events that started with the alleged accusation of a student in his care at Gillespie school on May 21, 1999, and the stressful events that subsequently followed including incarceration and being labeled a child abuser."

In response to a request from the claimant's attorney, Dr. Blechman authored a report dated December 3, 2001, in which he outlined his treatment of the claimant since September 1995. Dr. Blechman noted that, although the claimant suffered from anxiety disorder, dysthmic disorder and obsessive-compulsive disorder, he was functioning as a teacher until his arrest and incarceration on May 24, 1999. According to Dr. Blechman, the events of May 24, 1999, caused a severe exacerbation of the claimant's symptoms. He disagreed with Dr. Kelly's opinions, most notably as they relate to his diagnosis of an antisocial personality disorder. Dr. Blechman stated that he always found the claimant to be forthcoming and truthful. He reasserted his opinion that the claimant is permanently disabled from returning to classroom duties "solely because of the exacerbation of symptoms that were caused by the incident of May 24, 1999, and the sequelae flowing from this incident when he was arrested, handcuffed and jailed because he performed his duties as a school teacher."

Following a hearing, the arbitrator denied the claimant benefits under the Act, concluding that the action of the police that caused the claimant's injury "is so remote from the work activity, it does not arise out of the employment with the [Board]." The arbitrator's decision also states that he "adopts the findings of Dr. Kelly and Dr. Ganellen on the issue of causation."

The claimant sought a review of the arbitrator's decision before the Commission. In a unanimous decision, the Commission affirmed and adopted the arbitrator's decision.

The claimant filed a petition for judicial review of the Commission's decision in the circuit court of Cook County. The circuit court confirmed the Commission's decision, and this appeal followed.

We first address the claimant's argument that the Commission erred in finding that his injuries did not arise out of his employment with the Board. Critical to our analysis of the issue are the specific findings of the arbitrator which were adopted by the Commission. The arbitrator found that the proximate cause of the claimant's claimed condition of increased anxiety, panic, and depression "is the action of the police officers in arresting and incarcerating him at the behest of Ms. Sears." According to the arbitrator, "[t]he claimed injury in this case was caused by the treatment Rotberg [claimant] suffered at the hands of the police." The arbitrator noted that "[the claimant] was not injured by the fighting students, but by the police who handcuffed him and took him to the police station and forced him to urinate on the floor." Relying in part upon our supreme court's decision in *Brady v. Louis Ruffolo & Sons Construction Co.*, 143 Ill. 2d 542, 578 N.E.2d 921 (1991), which rejected the positional risk doctrine, the arbitrator concluded that the claimant's injuries did not arise out of his employment, as the actions of the police which caused those injuries were too "remote" from his work activity. As a consequence, the arbitrator denied the claimant benefits under the Act. Although the question of causation is a factual matter to be determined by the Commission (*Amoco Oil Co. v. Industrial Comm'n*, 218 Ill. App. 3d 737, 747, 578 N.E.2d 1043 (1991)), we believe that the arbitrator's analysis of the question which the Commission adopted is flawed.

■ An employee's injury is compensable under the Act if it arises out of and in the course of the employment. 820 ILCS 305/2 (West 1998). Both elements must be present at the time of the claimant's injury in order to justify compensation. *Illinois Bell Telephone Co. v. Industrial Comm'n*, 131 Ill. 2d 478, 483, 546 N.E.2d 603 (1989). The phrase "in the course of" relates to the time, place and circumstance of the injury. A claimant's injury is received in the course of his employment when it occurs while he is working, at a place where he

may reasonably be while performing his duties, and while he is fulfilling those duties or engaged in something incidental thereto. *Scheffler Greenhouses, Inc. v. Industrial Comm'n*, 66 Ill. 2d 361, 366-67, 362 N.E.2d 325 (1977). "Arising out of one's employment" refers to the origin or cause of the claimant's injury. A causal connection is demonstrated if the claimant establishes that the origin of his injury lies in some employment-related risk or if the conditions or nature of the employment increases his risk of harm beyond that to which the general public is exposed. *Brady*, 143 Ill. 2d at 548. An injury arises out of the employment when its origin is found in some risk connected with, or incidental to, the employment. "A risk is incidental to the employment where it belongs to or is connected with what an employee has to do in fulfilling his duties." *Caterpillar Tractor Co. v. Industrial Comm'n*, 129 Ill. 2d 52, 58, 541 N.E.2d 665 (1989).

The record establishes that the claimant was at school performing his duties as a teacher when he was summoned to the offices, arrested, and handcuffed by the police. There is no dispute between the parties on the question of whether he was in the course of his employment at that time. The issue in this case, and the one decided by the Commission adversely to the claimant, is whether his injuries arose out of his employment with the Board.

After observing that any member of the general public can be exposed to a malicious prosecution or police brutality, the arbitrator appears to suggest that the proper remedy available to the claimant is a malicious prosecution action against Sears and a civil action for "police brutality" against the police department. Additionally, the arbitrator found that the Board played no part in causing the claimant's arrest or mistreatment at the hands of the police and could not have prevented the police officers from coming to the school to arrest him based on Sears' complaint. Based upon that rationale, the arbitrator concluded that the actions which caused the claimant's injury are so remote from his work activity that the injury did not arise out of his employment. The Commission adopted both the arbitrator's findings and his conclusion in this regard.

Whether the Board caused the claimant's arrest or could not have prevented it is not necessarily determinative of the issue of whether the claimant's injury arose out of his employment. Although it is certainly true that injuries are not compensable under the Act merely because a claimant's employment placed him in a particular place at a particular time (*Brady*, 143 Ill. 2d at 550), the risk of arrest in this case was incidental to the fulfillment of the claimant's duties as a teacher.

It is undisputed that the claimant was acting in his capacity as a

teacher employed by the Board when he broke up the fight between Jason Sears and another student on May 21, 1999. The claimant was not arrested merely because he happened to be at work when the police arrived at Gillespie School on May 24, 1999. Rather, he was arrested based on Ms. Sears' accusation that he beat her son. Absent any facts supporting the proposition that the claimant stepped outside of the scope of his employment as a teacher when he broke up the fight involving Jason Sears, the facts in this case lead to a single conclusion; namely, that the risk of the claimant being arrested and charged with a battery upon Jason Sears was incidental to his actions as a teacher in breaking up a fight between two students. When, as in this case, an employee is arrested for conduct committed within the scope of his employment and incidental to the performance of his duties and suffers an injury as a consequence of such an arrest, the injury arises out of the employment for purposes of determining compensability under the Act. *Kochilas v. Industrial Comm'n*, 274 Ill. App. 3d 1088, 1090-92, 654 N.E.2d 568 (1995).

■ Although we are reluctant to find a factual determination of the Commission to be against the manifest weight of the evidence, we must do so in this case as the evidence in the record compels us to conclude that the injuries suffered by the claimant when he was arrested, handcuffed, and incarcerated on May 24, 1999, arose out of his employment with the Board.

Our analysis continues, however, as the Commission also adopted that portion of the arbitrator's decision which "adopts the findings of Dr. Kelly and Dr. Ganellen on the issue of causal connection." The initial question for resolution is the meaning of the arbitrator's decision in this regard.

As noted earlier, Drs. Kelly and Ganellen were both of the opinion that the claimant suffered from long-standing mental disorders which predated the events of May 24, 1999. Specifically, Dr. Ganellen opined that the symptoms of emotional distress that the claimant reported after his arrest and incarceration "should be considered a continuation of his lifelong, persistent anxiety and depression, rather than the onset of a new condition." However, Dr. Ganellen opined that the claimant's increased worry, tension and anxiety after the May 24, 1999, incident "appear to be an exacerbation of his condition." Whereas, Dr. Kelly opined that the claimant does not have a mental disorder that is causally related to the events of May 1999. These opinions can be reconciled only if one interprets the Commission as having adopted the findings of Drs. Kelly and Ganellen that the claimant had lifelong psychological problems which were not caused by the May 24, 1999, incident, but rested its ultimate causation finding on its

earlier determination that the injuries caused by the claimant's arrest, handcuffing, and incarceration on May 24, 1999, did not arise out of his employment. Having found that the injuries sustained by the claimant were caused by his arrest and incarceration, it would be internally inconsistent for the Commission to have found an absence of causation on any other basis.

Although Drs. Kelly and Ganellen agree that the claimant had lifelong psychological problems which were not caused by the May 24, 1999, incident, that conclusion alone does not preclude recovery of benefits under the Act. An employment accident need not be the sole cause or even the principal cause of a claimant's injury to render it compensable under the Act. The law is clear that aggravation or acceleration of a preexisting condition is a compensable injury if caused by some accident arising out of and in the course of the claimant's employment. *Riteway Plumbing v. Industrial Comm'n*, 67 Ill. 2d 404, 412, 367 N.E.2d 1294 (1977).

The evidence of record in this case establishes that, prior to the events of May 24, 1999, the claimant was capable of discharging his duties as a teacher, notwithstanding his long-standing psychological problems. Drs. Weinberg, Blechman, Utley, Cullinane, Ganellen, and Leavitt each diagnosed the claimant as suffering from mental disorders that were either, in their respective opinions, caused by or exacerbated by his arrest, handcuffing, and incarceration on May 24, 1999, and, as a result, rendered the claimant unable to function as a teacher. It is only Dr. Kelly who found that the claimant does not have a mental disorder that is causally related to the events of May 1999. As noted, however, his opinion in that regard is contrary to the opinion of Dr. Ganellen, whose opinion on causation was also adopted by the Commission.

In light of our holding that, whatever injury the claimant suffered as a result of his arrest, handcuffing, and incarceration arose out of and in the course of his employment with the Board, the Commission's seemingly inconsistent adoption of the findings of both Drs. Kelly and Ganellen on the issue of causation, and the weight of medical authority supporting the proposition that the claimant either suffered a mental disorder or an exacerbation of an existing mental disorder as a proximate result of his arrest and incarceration on May 24, 1999, which has rendered him unable to teach, we also conclude that the Commission's finding that there is no causal connection between the claimant's employment and the injuries suffered as a consequence of his arrest and incarceration is against the manifest weight of the evidence.

Based upon the foregoing analysis, we reverse the judgment of the

circuit court confirming the Commission's decision denying the claimant benefits under the Act. Additionally, we remand this matter to the Commission with directions to find that the claimant suffered injuries as a consequence of his arrest and incarceration on May 24, 1999, which arose out of and in the course of his employment with the Board and to conduct further proceedings consistent with this opinion.

Reversed and remanded to the Illinois Workers' Compensation Commission with directions.

CALLUM, HOLDRIDGE, and GOLDENHERSH, JJ., concur.

PRESIDING JUSTICE McCULLOUGH, dissenting:

I respectfully disagree with the majority's determination that the Commission's decision was against the manifest weight of the evidence.

The majority places importance on certain findings of the arbitrator to support its decision. The majority also states that only Dr. Kelly found no causal connection with the events of May 1999. Dr. Kelly's findings are sufficient in themselves to support the Commission decision. The following findings by the arbitrator and adopted by the Commission support the Commission's decision:

"Dr. Kelly diagnosed mood disorder, dysthymic disorder, panic disorder with agoraphobia, obsessive compulsive disorder, history of eating disorder, and personality disorder. Dr. Kelly concludes that Rotberg does not have a mental disorder that is causally related to the incident on his job as a teacher in May 1999. He adds that there is no sign of post-traumatic stress disorder. Dr. Kelly states that treatment records do not indicate persistent inability to function or a new diagnosis or new symptoms not present prior to May 20, 1999. (R. Ex. 2)

Ronald Ganellen, PhD, a clinical psychologist, conducted psychological testing on Rotberg. (R. Ex. 3) Dr. Ganellen states that the results of the psychological testing data and his review of the medical records are consistent with longstanding emotional difficulties beginning in childhood and persisting continuously until the present time. Dr. Ganellen adds that the symptoms of emotional distress presented by Rotberg should be considered a continuation of his lifelong persistent anxiety and depression rather than the onset of a new condition.

The Arbitrator finds that the proximate cause of Rotberg's claimed condition of increased anxiety, panic, and depression is the action of the police officers in arresting and incarcerating him, at the behest of Mrs. Sears. There is no testimony or medical evidence

indicating that his condition is connected to the act of separating the two fighting students.

* * *

The claimed injury in this case was caused by the treatment Rotberg suffered at the hands of the police. He was not injured by the fighting students, but by the police officers who handcuffed him and took him to the police station and forced him to urinate on the floor. The police officers arrested him following a complaint filed against Rotberg by the mother of Jason Sears; his employer played no part in procuring his arrest.

Rotberg argues that, but for the fact that he was at work, separating the two fighting students, the mother would not have filed the complaint. Had Ms. Sears not filed the complaint, the police would not have come. Had the police not come, Rotberg would not have been handcuffed. Had Rotberg not been handcuffed, he would not have suffered an aggravation of his psychological condition.

* * *

The respondent played no part in causing Rotberg's arrest, and indeed, could not have prevented the police officers from coming to the school to arrest Rotberg based on Sears' complaint of battery. And most certainly, the respondent played no part in—and could neither reasonably foresee nor prevent—the police's mistreatment of Rotberg, which, in the final analysis, is the cause of his present condition."

A review of the record supports the Commission's decision. The order of the circuit court should be affirmed.